WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice* pending)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice* pending)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice* pending)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION,**<br><br>              **Debtor.**<br><br>**Tax I.D. No. 94-3234914** | Case Nos.    19 - _____ (___)<br>              19 - _____ (___)<br><br>Chapter 11<br><br>**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 507 AND FED. R. BANKR. P. 6003 AND 6004 FOR INTERIM AND FINAL CASH AUTHORITY TO (I) (A) CONTINUE EXISTING CASH MANAGEMENT SYSTEM, (B) HONOR CERTAIN PREPETITION OBLIGATIONS RELATED TO THE USE THEREOF, (C) CONTINUE INTERCOMPANY ARRANGEMENTS, (D) CONTINUE TO HONOR OBLIGATIONS RELATED TO JOINT INFRASTRUCTURE PROJECTS, AND (E) MAINTAIN EXISTING BANK ACCOUNTS AND BUSINESS FORMS; AND (II) WAIVING THE REQUIREMENTS OF 11 U.S.C. § 345(b)** |
| **In re:**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>              **Debtor.**<br><br>**Tax I.D. No. 94-0742640** | Date:<br>Time:<br>Place: |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105(a), 345(b), 363(b), 363(c), and 364(a) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), requesting interim and final authority, in the ordinary course of business and consistent with the Debtors' prepetition practices, to (i)(a) continue operating their existing cash management system (the "**Cash Management System**"), as described herein, including the continued maintenance of existing bank accounts at the Debtors' banks (the "**Banks**"), (b) honor certain prepetition obligations related to the Cash Management System, (c) continue certain intercompany arrangements among the Debtors and certain non-Debtor affiliates and subsidiaries (the "**Non-Debtor Affiliates and Subsidiaries**"), (d) continue to honor all obligations with respect to certain Joint Infrastructure Projects (as defined below), and (e) maintain existing business forms; and (ii) waive the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Bank Accounts (as defined below).

In furtherance of the foregoing, the Debtors request that the Court authorize, but not direct, the Banks to receive, process, honor, and pay all checks presented for payment and electronic payment requests relating to the foregoing to the extent the Debtors have sufficient funds standing to their credit with such Bank, whether such checks were presented or electronic request were submitted before or after the Petition Date (as defined below), and that all such Banks be authorized to rely on the Debtors' designation of any particular check or electronic payment request as appropriate pursuant to this Motion without any duty of further inquiry and without liability for following the Debtors' instructions. A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").

# **TABLE OF CONTENTS**

                                                                                        **Page**

I.      JURISDICTION ....................................................................................... 7

II.     BACKGROUND ...................................................................................... 7

III.    THE CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS ................................... 7

        A.      Collection Accounts .................................................................... 10

        B.      Concentration Accounts ............................................................... 12

        C.      Disbursement Accounts ................................................................ 13

        D.      Intercompany Transactions .......................................................... 15

        E.      Joint Infrastructure and Co-Ownership Projects ........................... 19

        F.      Short-Term Investment Policy ....................................................... 19

        G.      Bank and Payment Processing Fees ............................................... 20

        H.      The Debtors' Existing Business Forms and Checks ......................... 21

IV.     BASIS FOR RELIEF REQUESTED ...................................................................... 21

        A.      Continuation of the Cash Management System is in the Best Interests of
                the Debtors and All Other Parties in Interest ................................... 21

        B.      Continued Performance of Intercompany Transactions Is Warranted ....... 27

        C.      Maintenance of the Debtors' Existing Bank Accounts and Business Forms
                is Warranted .............................................................................. 28

        D.      Waiver of the Requirements of Section 345(b) of the Bankruptcy Code Is
                Warranted .................................................................................. 30

V.      RESERVATION OF RIGHTS ............................................................................. 33

VI.     IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003 .. 33

VII.    REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS .......................................... 34

VIII.   NOTICE ..................................................................................................... 34

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

# **TABLE OF AUTHORITIES**

**Cases**                                                                          Page(s)

*In re Adams Apple, Inc.*,
    829 F.2d 1484 (9th Cir. 1987) ...............................................................26, 27

*In re Anchorage Nautical Tours, Inc.*,
    145 B.R. 637 (B.A.P. 9th Cir. 1992)...........................................................25

*In Matter of B & W Enterprises, Inc.*,
    713 F.2d 534 (9th Cir. 1983) ......................................................................26

*Berg & Berg Enterprises, LLC v. Boyle*,
    178 Cal. App. 4th 1020 (2009) ..................................................................24

*In re Blue Earth, Inc.*,
    Case No. 16-30296-DM (Bankr. N.D. Cal. Mar. 23, 2016) .......................27

*F.D.I.C. v. Castetter*,
    184 F.3d 1040 (9th Cir. 1999) ...................................................................24

*In re Chateaugay Corp.*,
    80 B.R. 279 (S.D.N.Y. 1987).....................................................................26

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    60 B.R. 612 (Bankr. S.D.N.Y. 1986).........................................................24

*In re Curry & Sorensen, Inc.*,
    57 B.R. 824 (B.A.P. 9th Cir. 1986).............................................................25

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017) .................................................................................25

*In re Eagle–Picher Indus., Inc.*,
    124 B.R. 1021 (Bankr. S.D. Ohio 1991)....................................................26

*In re Financial News Network, Inc.*
    134 B.R. 732 (Bankr. S.D.N.Y. 1991)........................................................25

*In re First Protection, Inc.*,
    440 B.R. 821 (B.A.P. 9th Cir. 2010)...........................................................23

*Gordon v. Hines (In re Hines)*,
    147 F.3d 1185 (9th Cir. 1998) ...................................................................27

*In re Gulf Air*,
    112 B.R. 152 (Bankr. W.D. La. 1989)........................................................26

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 4 of 35

*In re Ionosphere Clubs, Inc.*,
   98 B.R. 174 (Bankr. S.D.N.Y. 1989) ..................................................................24

*In re Just For Feet, Inc.*,
   242 B.R. 821 (D. Del. 1999) ...........................................................................25

*Meoli v. Am. Med. Serv. of San Diego*,
   287 B.R. 808 (S.D. Cal. 2003) .........................................................................23

*Miltenberger v. Logansport, C&S W.R. Co.*,
   106 U.S. 286 (1882) ......................................................................................25

*In re Nellson Nutraceutical, Inc.*,
   369 B.R. 787 (Bankr. D. Del. 2007) ..................................................................23

*In re NVR L.P.*,
   147 B.R. 126 (Bankr. E.D. Va. 1992) .................................................................26

*In re OccMeds Billing Servs., Inc.*,
   Case No. 07-28444, 2008 WL 73690 (Bankr. E.D. Cal. Jan. 3, 2008) ..........................23

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.*),
   147 B.R. 650 (S.D.N.Y. 1992) .........................................................................24

*In re Pettit Oil Co.*,
   No. 13-47285, 2015 WL 6684225 (Bankr. W.D. Wash. Oct. 22, 2015) ...........................5

*In re RDIO, Inc.*,
   Case No. 15-31430-DM ...................................................................................27

*In re Roth Am., Inc.*,
   975 F.2d 949 (3d Cir. 1992) .............................................................................23

*Scouler & Co., LLC v. Schwartz*,
   No. 11-CV-06377 NC, 2012 WL 1502762 (N.D. Cal. Apr. 23, 2012) ...........................24

*In re Serv. Merch. Co.*,
   240 B.R. 894 (Bankr. M.D. Tenn. 1999) .............................................................33

*Smith v. Van Gorkom*,
   488 A.2d 858 (Del. 1985) ................................................................................24

*In re Structurlite Plastics Corp.*,
   86 B.R. 922 (Bankr. S.D. Ohio 1988) .................................................................26

*In re Tri-Valley Learning Corporation*,
   Case No. 16-43112-CN (Bankr. N.D. Cal. December 6, 2016) .....................................27

**Statutes**

11 U.S.C. § 105(a) ..........................................................................2, 23, 25, 26

11 U.S.C. § 345(a) ................................................................................31, 32

11 U.S.C. § 345(b) ........................................................................... *passim*

11 U.S.C. § 363 ..................................................................................23, 24

11 U.S.C. § 363(b) ...............................................................................2, 24

11 U.S.C. § 363(c) .................................................................2, 23, 28, 29

11 U.S.C. § 364(a) ...................................................................................2

11 U.S.C. § 365 .......................................................................................34

11 U.S.C. § 1107 ....................................................................................23

11 U.S.C. § 1107(a) ............................................................................8, 25

11 U.S.C. § 1108 ...............................................................................8, 23

28 U.S.C. § 157 ........................................................................................8

28 U.S.C. § 1334 .....................................................................................8

28 U.S.C. § 1408 .....................................................................................8

28 U.S.C. § 1409 .....................................................................................8

31 U.S.C. § 9303 ....................................................................................25

**Other Authorities**

Asbestos Hazard Emergency Response Act ........................................9

B.L.R. § 2015-1(a) .............................................................................1, 21

Fed. R. Bankr. P. 2002 .........................................................................35

Fed. R. Bankr. P. 6003 ...............................................................2, 34, 35

Fed. R. Bankr. P. 6004 .....................................................................2, 28

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*,
     General Order 24 (N.D. Cal.)........................................................7

Sarbanes–Oxley Act of 2002 .............................................................20

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 6 of 35

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.  JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  BACKGROUND

On the date hereof (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee has been appointed in either of the Chapter 11 Cases.

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the Declaration of Jason P. Wells, Senior Vice President and Chief Financial Officer of PG&E Corp., filed contemporaneously herewith in support of the Debtors' chapter 11 petitions and related first day relief (the "**Wells Declaration**").

## III.  THE CASH MANAGEMENT SYSTEM AND BANK ACCOUNTS

In the ordinary course of business, the Debtors utilize their Cash Management System, which is an integrated, centralized system designed to collect, transfer, and disburse funds generated by their electricity and natural gas operations.  The Cash Management System has several main components: (i) cash collection, including the collection of payments made to the Debtors from revenue generated in the ordinary course through the sale and delivery of electricity and natural gas to customers; (ii) relatively minimal cash transfers among the Debtors and certain Non-Debtor Affiliates and Subsidiaries; and (iii) cash disbursements that fund the Debtors' business operations and related obligations.  Although the Utility and PG&E Corp. each maintain separate systems, the Cash Management System is an integrated system.  Pursuant to that certain *Restated Continuing Services*

*Agreement*, dated October 15, 1999, between the Utility and PG&E Corp, (the "**PG&E Corp. CSA**"), the Utility operates the cash management system of PG&E Corp. and all transfers between accounts held by PG&E Corp. and the Utility are made pursuant to wire transfers in accordance with the PG&E Corp. CSA. It is critical that the Cash Management System remains intact during these Chapter 11 Cases to ensure the seamless continuation of transactions and the uninterrupted supply of power and electricity to the Utility's customers.

The Cash Management System facilitates cash monitoring, forecasting, and reporting and enables the Debtors to maintain control over the administration of the Bank Accounts located at the Banks, including, but not limited to, the accounts listed on Schedule 1 annexed to the Proposed Interim Order. The Debtors maintain one-hundred eight (108) bank accounts (each, a "**Bank Account**" and, collectively, the "**Bank Accounts**") at various Banks, of which thirty (30) are actively used in the Cash Management System (such accounts, the "**Primary Bank Accounts**"). Of the Primary Bank Accounts, sixteen (16) accounts are maintained at The Bank of New York Mellon ("**BNYM**"), six (6) accounts are maintained at Bank of America, N.A. ("**BoAML**"), four (4) accounts are maintained at Citibank, N.A. ("**Citi**"), one (1) account is maintained at Royal Bank of Canada ("**RBC**"), two (2) accounts are maintained at Union Bank of California ("**Union Bank**"), and one (1) account is maintained at U.S. Bank, N.A ("**U.S. Bank**"). Twenty-one (21) of the Primary Bank Accounts are maintained at Banks designated as authorized depositories by the Office of the United States Trustee for Region 17 (the "**U.S. Trustee**") pursuant to the U.S. Trustee's Guidelines (the "**UST Guidelines**").

The remaining seventy-eight (78) Bank Accounts are not utilized in the day-to-day flow of funds throughout the Cash Management System and are comprised mainly of specialized accounts, including: (a) forty-nine (49) tax-exempt bond accounts, maintained in connection with each of the Debtors' tax-exempt debt issuances, held at Deutsche Bank Trust Company Americas (the "**Deutsche Bank Bond Accounts**"), (b) six (6) escrow accounts maintained in connection with ongoing partnerships with third-parties held at U.S. Bank N.A. Global Corporate Trust Services (the "**U.S Bank Escrow Accounts**"), (c) three (3) trust accounts maintained in connection with retirement benefits – two (2) held at Wells Fargo Bank N.A. (Acct No. XX5300 and XX5400) and one (1) at Fidelity Management Trust Company (Acct No. XX0137) (the "**Retiree Benefit Trust Accounts**"), (d) one

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 8 of 35

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(1) account to hold certain reserve funds for employees who work with asbestos in the course of their employment required under the Asbestos Hazard Emergency Response Act held at BoAML (Acct No. XX2988) (the "**Asbestos Medical Reserve Account**"), (e) two (2) accounts for contributions to political action committees funded from voluntary deductions from employee payroll held at Bank of Marin (Acct Nos. XX0132 and XX0140) (the "**PAC Accounts**"), (f) two (2) legacy accounts established prior to the transition to payroll at BoAML (Acct No. XX7115) for employees to cash checks held at BNYM (Acct No. XX4017) and at BoAML (Acct No. XX1675) (the "**Legacy Payroll Accounts**"), (g) one (1) account that was used to hold funds from PG&E's Corp.'s Commercial Paper Program held at Citi (Acct No. XX9167) (the "**CP Account**" and together with the Deutsche Bank Bond Accounts, the U.S Bank Escrow Accounts, the Retiree Benefit Trust Accounts, the Asbestos Medical Reserve Account, the PAC Accounts, and the Legacy Payroll Accounts, the "**Specialty Accounts**"), and (h) fourteen (14) dormant accounts with no activity or *de minimus* balances (the "**Dormant Accounts**").

The Debtors maintain robust controls relating to the Cash Management System. The Cash Management System is overseen by personnel working in the Banking and Money Management ("**B&MM**") division of the Utility's treasury department (the "**Treasury Department**"). B&MM manages all aspects of the Cash Management System, providing services that include cash positioning, cash concentration, wire transfers, automated clearing house ("**ACH**") transfers, tax payments, and the issuance of short-term debt and purchase or redemption of investments, as well as managing bank accounts for certain Non-Debtor Affiliates and Subsidiaries. On a daily basis, B&MM prepares a cash summary that reflects the cash position after incoming and outgoing payments (via cash, wire transfer, ACH, or check), including short-term debt and short-term investment purchases or redemptions. Although certain recurring electronic payments are made automatically, disbursements by wire transfer require dual approval, and disbursements by check are reconciled before they clear. In preparing the daily cash summary, B&MM conducts a review of cash account balances, confirms that all manual wire transfers have been properly authorized, and determines whether all investments are in line with the Debtors' short-term investment policy (the "**Short-Term Investment Policy**"). Under the oversight of each of the Debtor's Controller, corporate accounting reconciles all Bank Account

balances against the Debtors' books and records on a monthly basis. Various levels of authorizations are required for the release of disbursements, which are determined by the size and type of the disbursement.

As explained in further detail below, the Cash Management System is generally comprised of four (4) different types of accounts: (a) collection accounts into which cash and other receivables generated from the Debtors' operations are deposited (collectively, the "**Collection Accounts**"), (b) concentration accounts into which cash is automatically swept from the various Collection Accounts on a daily basis (collectively, the "**Concentration Accounts**"), (c) disbursement accounts for designated disbursements (collectively, the "**Disbursement Accounts**"), and (d) the Specialty Accounts. An average of approximately $81.6 million in receipts and $86.0 million in disbursements flows through the Cash Management System per banking day. A diagram illustrating the general movement of cash through the Cash Management System is attached hereto as **<u>Exhibit B</u>**.

Given the complexity of the Debtors' operations and the volume of transactions processed through the Cash Management System each day, maintaining the Cash Management System in its current state is crucial to the Debtors' continued operations. Any disruption to the Cash Management System would unnecessarily and significantly disrupt the Debtors' operations, which may result in power outages or other service disruptions to the Debtors' customers, and may impede the successful administration of these Chapter 11 Cases.

### A. Collection Accounts

#### 1. Utility Collection Accounts

As part of its daily operations, the Utility collects cash, checks, wire transfers, ACH payments, and credit card and debit card payments from customers and certain third parties. As described below, these funding sources flow into the Utility Master Concentration Account (as defined herein) through nine (9) depository accounts (the "**Utility Depository Accounts**"). When the Utility is in receipt of proceeds from non-recurring funding sources such as tax refunds, debt issuances, and rebates issued by regional service operators and/or independent system operators, such proceeds are deposited directly into the Utility Master Concentration Account (as defined below).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

a)      Customer Depository Accounts

The Utility maintains five (5) Utility Depository Accounts (each a "**Utility Customer Depository Account**") that process customer payments.  Two (2) Utility Customer Depository Accounts (Acct Nos. XX5477 and XX7822) are held at BNYM, one (1) account (Acct No. XX1958) is held at Citi, one (1) account (Acct No. XX0817) is held at BoAML, and one (1) account (Acct No. XX5581) is held at Union Bank.  The BNYM, BoAML, and Citi Utility Customer Depository Accounts only accept electronic payments posted through online and mobile payment channels and customer ACH debits.  The Union Bank Utility Customer Depository Account collects cash and check payments that are either mailed to the Utility or made directly at the Utility's local offices.  All of the Utility Customer Depository Accounts, except for the Union Bank Account, are zero balance accounts, meaning they do not carry a cash balance at the end of each business day.  The funds in the Citi and BoAML Utility Customer Depository Accounts are swept into the Citi Utility Concentration Account and BoaML Utility Concentration Accounts (each as defined herein), respectively, on a daily basis, where the funds ultimately flow into the Utility Master Concentration Account.  The BNYM Utility Customer Depository Accounts are swept into the Utility Master Concentration Account on a daily basis.

b)      Utility Campground Collection Accounts

The Utility also maintains two (2) Utility Depository Accounts (the "**Utility Campground Depository Accounts**") that process payments from customers that use campgrounds owned by the Utility.  One (1) Utility Campground Depository Account is held at U.S. Bank (Acct No. XX2311) and one (1) Utility Campground Depository Account is held at BoAML (Acct No. XX2302).

c)      Non-Energy Collection Account

The Utility also maintains one (1) Utility Depository Account to collect funds from certain non-energy related revenue sources held at Citi (Acct No. XX2901).

d)      Outside Collections Accounts

In the ordinary course of business, the Utility contracts with third-parties to collect on customer accounts that have fallen into delinquency.  The proceeds of such activities are deposited into a Utility Customer Depository Account held at Citi (Acct No. XXX2316) (the "**Utility Outside Collection**

Account"). The Utility Outside Collection Account is a zero balance account and is swept into the Citi Utility Concentration Account on a daily basis.

### 2. PG&E Corp. Collection Accounts

As PG&E Corp.'s primary asset is its equity interest in the Utility, it does not maintain any third-party collection accounts.

### B. Concentration Accounts[1]

### 1. Utility Concentration Accounts

The Utility maintains three (3) accounts where it concentrates and collects cash from its various Depository Accounts (collectively, the "**Utility Concentration Accounts**"): (a) one (1) primary concentration account with BNYM (Acct No. XX9994) (the "**Utility Master Concentration Account**"); (b) one (1) customer deposit concentration account with BoAML (Acct No. XX3212) (the "**BoAML Utility Concentration Account**"); and (c) one (1) customer deposit concentration account with Citi (Acct No. XX0901) (the "**Citi Utility Concentration Account**"). The Utility funds its business operations and related expenditures from the revenues and funds that flow through the Utility Concentration Accounts, including payments of principal and interest on account of the Utility's prepetition debt and intercompany payments made to StanPac (as defined below), Gill Ranch (as defined below), and PG&E Corp. (pursuant to the PG&E Corp. CSA). The Utility Master Concentration Account serves as the Utility's main centralized operating account into which receipts and customer payments are ultimately deposited from the Utility Customer Depository Accounts and from which disbursements are made throughout the Cash Management System as necessary. Historically, the proceeds of financings and draws on the Utility's $3 billion prepetition unsecured revolving credit facility were deposited directly into the Utility Master Concentration Account. As of the date hereof, such facility had approximately $35 million of undrawn capacity. Additionally, from time to time, excess funds in the Utility Master Concentration Account at the close of market may be invested by B&MM on an overnight basis until the following business day, in accordance with the

---

[1] Prior to the Petition Date, the Utility issued commercial paper in the ordinary course of business to cover short-term liquidity needs (the "**Commercial Paper Program**"). Citi served as the issuing and payment agent with respect to issuances and redemptions of commercial paper under the Commercial Paper Program. The Commercial Paper Program is not currently active and the Debtors are not currently seeking relief to continue the Commercial Paper Program at this time.

Debtors' Short-Term Investment Policy, which is discussed in further detail below.

Funds in the BoAML Utility Customer Depository Account are automatically swept into the BoAML Utility Concentration Account on a daily basis. The funds in each of the Citi Utility Customer Depository Account and the Citi Utility Outside Collections Depository Account are automatically swept into the Citi Utility Concentration Account on a daily basis. Funds in the BoAML Utility Concentration Account and Citi Utility Concentration Account are manually drawn down to the Utility Master Concentration Account on a daily basis. The Utility Campground Depository Accounts are manual swept into the Utility Master Concentration Account on a periodic basis.

2. PG&E Corp. Concentration Accounts

PG&E Corp. concentrates and collects its cash in one primary account with BNYM (Acct No. XX9023) (the "**PG&E Corp. Master Concentration Account**"). PG&E Corp. funds its business operations and related expenditures from the revenues and funds that flow through the PG&E Corp. Master Concentration Account, including payments of principal and interest on account of PG&E's prepetition debt and intercompany payments made to the Utility pursuant to the PG&E Corp. CSA. The PG&E Corp. Master Concentration Account serves as PG&E Corp.'s main centralized operating account into which funds are ultimately deposited from transfers from the Utility pursuant to the PG&E Corp. CSA and from which disbursements are made throughout the Cash Management System as necessary.

Historically, the proceeds of financings and draws on PG&E Corp.'s $300 million prepetition unsecured revolving credit facility were deposited directly into the PG&E Corp. Master Concentration Account. As of the date hereof, the revolving credit facility is fully drawn. Additionally, from time to time, excess funds in the PG&E Corp. Master Concentration Account at the close of market may be invested by B&MM on an overnight basis until the following business day, in accordance with the Debtors' Short-Term Investment Policy, which is discussed in further detail below.

C. **Disbursement Accounts**

1. Utility Disbursement Accounts

The Utility uses the funds in the Utility Master Concentration Account to fund its ongoing operations through nine (9) disbursement accounts (collectively, the "**Utility Disbursement**

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 13 of 35

Accounts"). All of the Utility Disbursement Accounts are zero balance accounts. On a daily basis, the Utility projects its disbursement obligations and funds the Utility Disbursement Accounts accordingly. The following is a brief summary of the various Utility Disbursement Accounts.

- **Vendor Disbursement Account.** Two (2) disbursement accounts at BNYM (Acct Nos. XX9978 and XX9990) are designated to fund nearly all operating expenses and capital expenditures related to the Utility's business operations, including all third party vendor, supplier payments and customer payments as well as employee expense reimbursements.

- **BoAML Payroll Disbursement Accounts.** One (1) disbursement account at BoAML (Acct No. XX7115) is used to fund employee payroll, which is funded from the BoAML Concentration Account.

- **Disability Disbursement Account.** The Utility maintains an account at BNYM (Acct No. XX8544) dedicated to making distributions to employee participants in the Utility's short-term disability plan.

- **Customer Refund and Rebate Accounts.** The Utility maintains two (2) additional disbursement accounts at BNYM (Acct Nos. XX3044 and XX3532) which distribute refunds, rebates, and reimbursements to the Utility's customers.

- **RBC Currency Exchange Account.** The Utility maintains a disbursement account with RBC (Acct No. XX0446) to facilitate purchases of natural gas from Canadian entities that only accept payment in Canadian dollars.

- **Gill Ranch Operating Account.** As discussed in more detail below, the Utility maintains an operating account for the Gill Ranch natural gas storage facility at BNYM (Acct No. XX4122).

- **Land Drafts Account.** The Utility maintains a disbursement account with BNYM (Acct No. XX0143) to issue checks in connection with health care and injury claims incurred by individuals and with the Utility's land management activities.

    2.    PG&E Corp. Disbursement Accounts

PG&E Corp. uses the funds in the PG&E Corp. Master Concentration Account to fund its ongoing operations through five (5) disbursement accounts (collectively, the "**PG&E Corp. Disbursement Accounts**"). All of the PG&E Corp. Disbursement Accounts are zero balance accounts. On a daily basis, PG&E Corp. projects its disbursement obligations and funds the PG&E Corp. Disbursement Accounts accordingly. The following is a brief summary of the various PG&E Corp. Disbursement Accounts.

- **Vendor Disbursement Account.** One (1) disbursement account at BNYM (Acct No. XX4558) is designated to fund nearly all operating expenses and capital expenditures related to PG&E Corp's operations, including all third-party vendor and supplier payments.

- **Payroll Disbursement Accounts.** One (1) disbursement account at BNYM (Account No. XX9946) (the "**PG&E Corp. Payroll Funding Account**") and two

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(2) payroll disbursement accounts at BoAML (Acct Nos. XX7981 and XX7107), with one utilized for checks and the other for direct deposit payments, each of such accounts is funded from the PG&E Corp. Payroll Funding Account.

- **Union Bank Payroll Account.** PG&E Corp. maintains one (1) payroll account at Union Bank of California (Acct No. XX9557) to comply with certain state law requirements.

### D. Intercompany Transactions

In the ordinary course of business, the Debtors maintain business relationships among themselves and with the Non-Debtor Affiliates and Subsidiaries, which result in intercompany receivables and payables (the "**Intercompany Transactions**"). The various categories of Intercompany Transactions are summarized in further detail below. The Debtors maintain records of all transfers and, therefore, can ascertain, trace, and account for all Intercompany Transactions, and will continue to do so during these Chapter 11 Cases. If the Intercompany Transactions were to be discontinued, the Cash Management System and related administrative controls would be disrupted to the detriment of the Debtors and all stakeholders. Accordingly, the Debtors are seeking authority to continue the Intercompany Transactions and make any prepetition payments related thereto.

### 1. The PG&E Corp. CSA

The Utility and PG&E Corp. are parties to the PG&E Corp. CSA. Under the terms of the PG&E Corp. CSA, PG&E Corp. provides certain corporate services to the Utility, including, among other things, management staffing, strategic planning, and investor relations support (the "**PG&E Corp. Affiliate Services**"). From time to time, PG&E Corp. also contributed certain equity securities to the Utility, which the Utility distributed to its employees in accordance with its share-based employee incentive plans (the "**PG&E Corp. Equity Contributions**"). The Utility and PG&E Corp. also share certain corporate services and allocate the relative costs of such services and expenses between each other, including, without limitation, accounting and audit functions, money management and investment services, payroll administration, legal, governance, and public relations (the "**Shared Services**"). Furthermore, the Utility funds certain of PG&E Corp.'s operating expenses, including, among other things, the purchase of insurance (the "**Corp. Expenses**"). The intercompany obligations and related transfers that arise under the PG&E Corp. CSA are governed by California Public Utility Commission (the "**CPUC**") Decisions 96-11-017 and 97-12-088, as well as certain other CPUC-

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 15 of 35

approved tariffs, and are generally subject to CPUC oversight. PG&E Corp. invoices the Utility on a monthly basis for reimbursement of the PG&E Corp. Affiliate Services, the Utility's allocation of the Shared Services, including the costs incurred by PG&E Corp. for the purchase of any associated goods during the preceding month, and, if applicable, the value of any PG&E Corp. Equity Contributions ultimately distributed to the Utility's employees (collectively, the "**Corp. CSA Claims**"). Likewise, the Utility invoices PG&E Corp. on a monthly basis for reimbursement of the costs of Shared Services allocated to PG&E Corp., including the costs of any associated goods, as well as PG&E Corp.'s allocated share of the Corp. Expenses that were incurred during the preceding month (collectively, the "**Utility CSA Claims**"). Corp. CSA Claims are paid via wire transfer directly out of the Utility Disbursement Account XX9978 (rather than book entry) and must be paid within 30 days of receipt of invoice. Similarly, Utility CSA Claims are paid via wire transfer directly out of the PG&E Corp. Disbursement Account XX4558 (rather than book entry) and must be paid within 30 days of receipt of invoice. During the 12-month period prior to the Petition Date, the monthly average of Corp. CSA Claims that the Utility owed to PG&E Corp. was approximately $13.8 million, and that PG&E Corp. owed to the Utility was approximately $1.8 million.

2. Non-Debtor Affiliates' and Subsidiaries' Continuing Services Agreements

The Utility is party to shared services arrangements with certain Non-Debtor Affiliates and Subsidiaries, including the following agreements: (a) that certain *Continuing Services Agreement* between the Utility and PG&E Corporation Support Services, Inc., dated Oct. 15, 1999, (b) that certain *Continuing Services Agreement* between the Utility and Pacific Energy Capital IV, LLC, dated July 27, 2010, (c) that certain *Continuing Services Agreement* between the Utility and PCG Capital, Inc., dated March 1, 2011, (d) that certain *Continuing Services Agreement* between the Utility and PG&E Corporation Support Services II, Inc., dated April 16, 2007, (e) that certain *Continuing Services Agreement* between the Utility and Certain Subsidiaries, including Eureka Energy Company, Natural Gas Corporation of California, and Pacific Energy Fuels Company, dated March 28, 2008, and (f) that certain *Continuing Services Agreement* between the Utility and Eureka Energy Company, dated February 23, 2009 (collectively, the "**Utility Non-Debtor CSAs**").

PG&E Corp. has also entered into shared services arrangements with certain Non-Debtor

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Affiliates and Subsidiaries, including the following agreements: (a) that certain *Continuing Services Agreement* between PG&E Corp. and PG&E Corporation Support Services, Inc., dated Oct. 13, 1999 and (b) that certain Continuing Services Agreement between PG&E Corp. and PG&E Corporation Support Services II, Inc., dated April 13, 2007 (collectively, the "**PG&E Corp. Non-Debtor CSAs**" and, together with the Utility Non-Debtor CSAs, the "**Non-Debtor CSAs**").

The Non-Debtor CSAs provide for the exchange of certain corporate services between the Debtors and the applicable Non-Debtor Affiliates and Subsidiaries (the "**Non-Debtor Shared Services**"). These Non-Debtor Shared Services are relatively *de minimis* and include, but are not limited to, joint purchasing of third-party services and goods as well as shared services related to joint corporate oversight, governance, support systems and personnel, to the extent such shared services conform to requirements of CPUC Decision 97-12-088. On an annual basis, the net cash impact on the Debtors with respect to amounts owed by the Debtors to the Non-Debtor Affiliates and Subsidiaries and to the Debtors by the Non-Debtor Affiliates and Subsidiaries is effectively neutral. As of the Petition Date, the Debtors estimate that they owe approximately $500,000 on account of Non-Debtor Shared Services.

3.     Standard Pacific Gas Line

The Utility holds an 86% ownership interest in Standard Pacific Gas Line, Inc. ("**StanPac**"). StanPac owns approximately 55 miles of natural gas pipelines located in Contra Costa County and the greater Sacramento area. The Utility operates StanPac and regularly incurs related operating expenses and capital costs (the "**StanPac Costs**"). Pursuant to that certain *System Management and Operating Agreement*, dated March 28, 1996, among the Utility, StanPac, and Chevron Pipeline Company (the "**StanPac Operating Agreement**"), the Utility invoices StanPac for the StanPac Costs on a monthly basis. Under the StanPac Operating Agreement, the Utility is obligated to fund its proportional, allocated share of certain non-capital expenses, including taxes (the "**StanPac Non-Capital Costs**"), on a monthly basis or at such time that such StanPac Non-Capital Costs come due. In the ordinary course of business, the Utility wires an amount equal to its allocated share of the previous month's StanPac Non-Capital Costs directly to StanPac. During the 12-month period prior to the Petition Date, the monthly average of StanPac Non-Capital Costs that the Utility paid to StanPac was approximately

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

$400,000. To maintain its pipeline connections to the intrastate and interstate natural gas pipeline grid, it is critical that the Utility continue paying the StanPac Costs and StanPac Non-Capital Costs in the ordinary course. As of the Petition Date, the Utility estimates that it owes approximately $400,000 on account of StanPac Costs and Stanpac Non-Capital Costs. and that approximately $400,000 of that amount will become due and payable within thirty (30) days after the Petition Date.

### 4. Gill Ranch Project

The Utility owns a 25% ownership interest in an underground natural gas storage facility (the "**Gill Ranch Project**") at Gill Ranch, located near Fresno, California, with a capacity of approximately 20 billion cubic feet. The other 75% of the Gill Ranch Project is owned by Gill Ranch Storage, LLC ("**Gill Ranch LLC**"), the operator of the Gill Ranch Project, which, in turn, is owned by Norwest Natural Gas. The Gill Ranch Project is linked to the Utility's natural gas mainline transmission system, allowing it to serve customers throughout California. Pursuant to that certain *Joint Project Agreement*, dated January 31, 2018, between Gill Ranch LLC and the Utility, and that certain *Operator Agreement*, dated January 31, 2008, between Gill Ranch LLC and the Utility (collectively, the "**Gill Ranch Agreements**"), the Utility is obligated to fund its proportionate, allocated share of operating costs, capital expenses, and certain other non-capital expenses for the Gill Ranch Project on a monthly basis (the "**Gill Ranch Costs**"). To maintain access to its emergency natural gas reserves it is critical that the Utility continue paying the Gill Ranch Costs in the ordinary course. Pursuant to the Gill Ranch Agreements, and in the ordinary course of business, the Utility deposits an amount equal to its allocated share of the previous month's Gill Ranch Costs into an account maintained by the Utility and held at BNYM (Acct. No. XX4122). The funds in such account are used by Gill Ranch LLC, as operator, to develop, operate and manage the Gill Ranch Project in accordance with approved programs and budgets. During the 12-month period prior to the Petition Date, the monthly average of Gill Ranch Costs that the Utility owed in connection with the Gill Ranch Project was approximately $200,000. As of the Petition Date, the Utility estimates that it owes approximately $200,000 on account of Gill Ranch Costs and that approximately $200,000 of that amount will become due and payable within thirty (30) days after the Petition Date

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 18 of 35

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

### E. Joint Infrastructure and Co-Ownership Projects

In the operation of its gas delivery and power distribution business, the Utility's infrastructure often interfaces with third-party equipment, including various gas pipeline and electric transmission interconnections. In some instances, certain pipelines, facilities, and transmission infrastructure are jointly owned by the Utility and one or more third-parties (the "**Joint Infrastructure Projects**") and, in some cases, are maintained to comply with regulatory and compliance requirements. The Joint Infrastructure Projects are typically governed by contractual arrangements between the Utility and the applicable third-party that provide for the scope of each party's obligations, including obligations to operate and maintain the infrastructure, contribute capital, and/or pay for services. During the 12-month period prior to the Petition Date, the monthly average that the Utility paid in connection with the Joint Infrastructure Projects was *de minimis* and the monthly average that the Utility received in connection with Joint Infrastructure Projects was approximately $600,000. As of the Petition Date, the Utility estimates that any amounts owed on account of the Joint Infrastructure Projects are *de minimis*. The Debtors seek authority to pay such amounts, including any amounts relating to the period prior to the Petition Date, as they come due in the ordinary course of business.

### F. Short-Term Investment Policy

The Short-Term Investment Policy, a copy of which is annexed hereto as **Exhibit C**, provides guidance for the Debtors to sweep excess funds in the Utility Master Concentration Account and the PG&E Corp. Master Concentration Account on an overnight basis. The Debtors move excess funds from those accounts to brokerage accounts held at BNYM (Acct No. XX98400 for the Utility and Acct No. XX18400 for PG&E Corp). The amounts invested pursuant to the Short-Term Investment Policy vary on a daily basis. Pursuant to the Short-Term Investment Policy, (i) investments are limited to highly marketable, interest-earning securities with stable market values and maturities of 12 months or less, and (ii) the Debtors must sufficiently assess the credit rating for parent companies of entities issuing securities prior to investing in those securities.[2] The objective of the Short-Term Investment

---

[2] In addition, B&MM invests certain funds held by the Utility in the Voluntary Disability Plan Insurance ("**VPDI**") brokerage account (Acct No. XX48400 held at BNYM), which account is maintained to comply with certain state requirements relating to employee contributions to the Debtors' VPDI.

Case: 19-30089    Doc# 7    Filed: 01/29/19    Entered: 01/29/19 00:37:02    Page 19 of 35

Policy is to achieve the best available yield while ensuring safety and preservation of principal and maintaining adequate liquidity to meet cash flow requirements. Investments made pursuant to the Short-Term Investment Policy are subject to multiple internal controls which require, among other things, that only designated employees may make investments pursuant to the Short-Term Investment Policy, all investments must be in compliance with the Sarbanes–Oxley Act of 2002, financial institutions must send confirmations of investment transactions directly to persons or departments responsible for recording cash transactions, and monthly investment statements must be reconciled to the Debtors' general ledger accounts. Typically, the following types of investments are approved pursuant to the Short-Term Investment Policy: (i) money market mutual funds, (ii) bank-related securities, (iii) U.S. government and government-sponsored securities, (iv) repurchase agreements, (v) corporate debt securities, and (vi) state and local government obligations. During the pendency of the Chapter 11 Cases, the Debtors will limit investments to U.S. government and government-sponsored securities that are backed by the full faith and credit of the United States.

## G. Bank and Payment Processing Fees

In the ordinary course of business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts, certain service charges, repayments on account of ordinary course ACH credit extensions (*e.g.*, in connection with the Banks' processing of refunds or mistaken payments into Utility Depository Accounts), and other related fees, costs, and expenses charged by the Banks (collectively, the "**Bank Fees**"). To the extent the balance in the applicable Bank Account decreases below a threshold amount established by the applicable Bank, the Debtors may incur additional fees for sending and receiving wire transfers, clearing checks, ACH transfers, and other transactions. In addition, the Debtors pay certain payment processing fees to third parties relating to payment support and processing for customers making payments by credit card, debit card, and ACH bank payment (collectively, the "**Payment Processing Fees**"). The Debtors currently pay approximately $140,000 per month on account of Bank Fees and approximately $200,000 per month on account of Payment Processing Fees. As of the Petition Date, the Debtors estimate that approximately $140,000 in Bank Fees and $400,000 in Payment Processing Fees are accrued and unpaid and will become due in the first thirty (30) days after the Petition Date. The Debtors seek authority to pay such amounts, including

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 20 of 35

any amounts relating to the period prior to the Petition Date, as they come due in the ordinary course of business.

### H. The Debtors' Existing Business Forms and Checks

In the ordinary course of business, the Debtors issue checks from time to time and use a variety of correspondence and business forms, including, but not limited to, letterhead, purchase orders, and invoices (collectively, the "**Business Forms**"). To minimize the expense to the Debtors' estates associated with developing and/or purchasing entirely new forms or otherwise complying with Bankruptcy Local Rule 2015-1(a),[3] the delay in conducting business prior to obtaining such forms, and the confusion of suppliers and other vendors, the Debtors seek authority to continue using their Business Forms substantially in the forms used immediately prior to the Petition Date, without reference therein to the Debtors' status as "Debtor in Possession." The Debtors do not believe that any prejudice will be suffered by any party of this relief is granted.

## IV. BASIS FOR RELIEF REQUESTED

The orderly operation of the Debtors' businesses requires the continuation of the Cash Management System during these Chapter 11 Cases. Accordingly, the Debtors seek authority in the ordinary course of business and consistent with the Debtors' prepetition practices to: (a) continue maintaining and operating the Cash Management System and to make ordinary course changes to it consistent with prepetition practices, (b) honor certain prepetition obligations related to the Cash Management System, (c) continue certain Intercompany Transactions with Non-Debtor Affiliates and Subsidiaries, (d) continue to honor all obligations with respect to certain Joint Infrastructure Projects, and (e) maintain existing Business Forms. Additionally, the Debtors seek a waiver of the requirements of section 345(b) of the Bankruptcy Code to the extent they apply to any of the Bank Accounts.

### A. Continuation of the Cash Management System is in the Best Interests of the Debtors and All Other Parties in Interest

As set forth above, the Debtors request authority to continue using the Cash Management System in the same manner as before the Petition Date and to implement ordinary course changes to

---

[3] Bankruptcy Local Rule 2015-1(a) requires that "[T]he signature card (or if there is none, the depository agreement) for any account containing funds which are the property of a bankruptcy estate must clearly indicate that the depositor or investor is a 'debtor-in-possession' or a trustee in bankruptcy."

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 21 of 35

the Cash Management System consistent with past practices.  Such relief is appropriate under sections 363 and 105(a) of the Bankruptcy Code.

Section 363(c)(1) of the Bankruptcy Code authorizes a debtor to "use property of the estate in the ordinary course of business without notice or a hearing."  11 U.S.C. § 363(c)(1).  The purpose of this section is to provide a debtor with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.

*Meoli v. Am. Med. Serv. of San Diego*, 287 B.R. 808, 817 n.3 (S.D. Cal. 2003) (stating that 363(c)(1) is designed to provide "wide-ranging management authority over the debtor"); *see also In re First Protection, Inc.*, 440 B.R. 821, 833 (B.A.P. 9th Cir. 2010) (a debtor may "enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and to use property of the estate in the ordinary course of business without notice or a hearing" when the debtor's business is being operated under sections 1107 and 1108 of the Bankruptcy Code); *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) ("Section 363 is designed to strike [a] balance, allowing a business to continue its daily operations without excessive court or creditor oversight and protecting secured creditors and others from dissipation of the estate's assets.") (citations omitted).  Included within the purview of section 363(c) of the Bankruptcy Code is a debtor's ability to continue "routine transactions" necessitated by a debtor's cash management system.  *See, e.g., In re OccMeds Billing Servs., Inc.*, Case No. 07-28444, 2008 WL 73690, at *3 (Bankr. E.D. Cal. Jan. 3, 2008) (noting that so long as bank accounts are not a creditor's cash collateral "the debtor does not need the permission of the court to use them in ordinary course of its business"); *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007) (noting that courts have shown a reluctance to interfere in a debtor's making of routine, day-to-day business decisions) (citations omitted).  Accordingly, the Debtors believe they are authorized pursuant to section 363(c)(1) of the Bankruptcy Code to continue the collection, concentration, and disbursement of cash pursuant to their Cash Management System as described above, including Intercompany Transactions.

The Cash Management System constitutes an ordinary-course and essential business practice providing significant benefits to the Debtors, including the ability to control corporate funds, ensure the maximum availability of funds when and where necessary, reduce borrowing costs and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 22 of 35

administrative expenses by facilitating the movement of funds, and ensure the availability of timely and accurate account balance information consistent with prepetition practices. The use of the Cash Management System has historically reduced the Debtors' expenses by enabling the Debtors to use funds in an optimal and efficient manner. Accordingly, the continued use of the Cash Management System without interruption is vital to the Debtors' business operations and the success of these Chapter 11 Cases.

The Court may approve the continuation of the Cash Management System even if it is determined to be outside of the ordinary course. Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purposes exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.* (*In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (*quoting Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also F.D.I.C. v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (the business judgment rule "requires directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would"). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts construing California corporate law have consistently declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith. *Scouler & Co., LLC v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at \*4 (N.D. Cal. Apr. 23, 2012); *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1046 (2009).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

DEBTORS' MOTION TO CONTINUE CASH
MANAGEMENT SYSTEM

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

The Court may also rely on its equitable powers under section 105 of the Bankruptcy Code to grant the relief requested in this Motion. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Accordingly, the Court may authorize the Debtors to continue to maintain the Cash Management System (including entering into and performing under the Intercompany Transactions), as well as to pay any prepetition amounts owed with respect thereto because such relief is necessary for the Debtors to carry out their fiduciary duties under section 1107(a) of the Bankruptcy Code. Under section 1107(a) of the Bankruptcy Code "the debtor in possession has the same fiduciary duties and liabilities as a Trustee. When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors." *In re Anchorage Nautical Tours, Inc.*, 145 B.R. 637, 643 (B.A.P. 9th Cir. 1992); *see also In re Curry & Sorensen, Inc.*, 57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("[T]he debtor's directors bear essentially the same fiduciary obligation to creditors and shareholders as would a trustee for a debtor out of possession").

Numerous Courts have acknowledged that payment of prepetition obligations, irrespective of statutory priorities, may be necessary to realize the objectives of the Bankruptcy Code, such as the preservation and enhancement of the value of a debtor's estate for the benefit of all creditors and other stakeholders. *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts have approved distributions that are not consistent with ordinary priority rules in instances where significant Code-related objectives, such as enabling a successful reorganization, would be served and listing examples such as "first-day wage orders that allow payment of employees' prepetition wages, critical vendor orders that allow payment of essential suppliers' prepetition invoices, and roll-ups that allow lenders who continue financing the debtor to be paid first on their prepetition claims"); *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (allowing payment of prepetition claim because debtor could not survive without maintaining customer relationship); *In re Financial News Network, Inc.* 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991) (payment of prepetition claims allowed

Case: 19-30088   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 24 of 35

if "critical to the debtor's reorganization"); *In re NVR L.P.*, 147 B.R. 126, 128 (Bankr. E.D. Va. 1992) (holding that "proponent of the payment must show substantial necessity"); *In re Eagle–Picher Indus., Inc.,* 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that payment must be "necessary to avert a serious threat to the chapter 11 process").

Although there is a Ninth Circuit decision which fails to recognize the grant of authority given by the Bankruptcy Code to elevate certain pre-petition payments over others, that case is easily distinguishable from these Chapter 11 Cases and the relief sought herein, as the pre-petition payments at issue there were made by the debtor without notice, hearing, or authorization from the Bankruptcy Court. *In Matter of B & W Enterprises, Inc.*, 713 F.2d 534, 535 (9th Cir. 1983). Furthermore, although the *B & W* court noted that the "necessity of payment" doctrine was established in railroad reorganization cases, *id.* at 535, numerous courts have extended the doctrine beyond the railroad reorganization context. *See, e.g., In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately"); *In re Gulf Air*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (finding that payment of prepetition wage and benefit obligations was in the best interest of creditors and necessary for the successful reorganization of the debtor and granting the debtor's motion to pay prepetition employee expenses); *In re Chateaugay Corp.*, 80 B.R. 279, 285 (S.D.N.Y. 1987) (finding that bankruptcy courts have the authority to authorize the debtor to pay certain prepetition claims).

Moreover, since *B & W*, the Ninth Circuit has noted in other instances that certain pre-petition payments should be authorized regardless of whether they are priority payments under the Bankruptcy Code. *See In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987). In that case, in rejecting the appellants' argument that the cross-collateralization clause in a financing agreement violated the "fundamental tenet of bankruptcy law that like creditors must be treated alike," the Court of Appeals noted that the argument was "flawed because the fundamental tenet conflicts with another fundamental

tenet – rehabilitation of debtors, which may supersede the policy of equal treatment." *Id.* The Ninth Circuit further stated that:

> [c]ases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts.

*Id.*

Numerous courts within the Ninth Circuit have followed the reasoning of *In re Adams Apple* in holding that the payment of certain pre-petition claims is not categorically barred when the payments promote the rehabilitation of the debtor. *See, e.g., In re Pettit Oil Co.*, No. 13-47285, 2015 WL 6684225, at *8 (Bankr. W.D. Wash. Oct. 22, 2015) (*citing In re Adams Apple Inc.* for proposition that it "is permissible to treat prepetition debts unequally when necessary for rehabilitation."); *Gordon v. Hines (In re Hines)*, 147 F.3d 1185, 1191 (9th Cir. 1998) (applying "essentially a doctrine of necessity" to provide for the payment of the fees of debtor's counsel in chapter 7 cases because without this right the "entire [chapter 7] system would suffer a massive breakdown"). Furthermore, several courts within this Circuit have granted relief substantially similar to that sought herein. *See, e.g., In re Tri-Valley Learning Corporation*, Case No. 16-43112-CN (Bankr. N.D. Cal. December 6, 2016) (approving maintenance of prepetition cash management system); *In re Blue Earth, Inc.*, Case No. 16-30296-DM (Bankr. N.D. Cal. Mar. 23, 2016) (same); *In re RDIO, Inc.*, Case No. 15-31430-DM (Bankr. N.D. Cal. Nov. 20, 2015 (same). Maintaining the existing Cash Management System and satisfying certain prepetition obligations related thereto plainly is in the best interests of the Debtors' estates and all parties in interest, and, therefore, should be approved. As stated, if the Debtors are required to significantly alter the way in which they collect and disburse cash throughout the Cash Management System, their operations will likely experience severe disruptions, which will negatively impact the Debtors' customers and their estates to the detriment of all parties in interest.

In furtherance of the foregoing, the Debtors request that all Banks at which the Bank Accounts are maintained be authorized to continue to administer such accounts as they were maintained prepetition, without interruption, in the ordinary course of business. The Debtors also request authority to pay Bank Fees as the come due, including the prepetition Bank Fees that remain unpaid as of the

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 26 of 35

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Petition Date, estimated to be in the aggregate amount of $140,000. Payment of the Bank Fees is in the best interests of the Debtors, their estates, and all parties in interest as it will prevent any disruption to the Cash Management System. Moreover, because the Banks may have setoff rights with respect to the prepetition Bank Fees, payment of the prepetition Bank Fees should not affect other parties in interest and would merely be a matter of timing. The Banks should also be authorized to pay any and all drafts, wires, and ACH transfers issued on the Bank Accounts for payment of any claims arising before the Petition Date, to the extent payment of such claims are approved by an order of the Bankruptcy Court, in each case so long as sufficient funds exist in these accounts. Similarly, the Debtors request authority to pay all Payment Processing Fees as they come due, including the prepetition Payment Processing Fees that remain unpaid as of the Petition Date, estimated to be in the aggregate amount of $400,000. Payment of the Payment Processing Fees will prevent any disruption to the Debtors' ability to collect payments from their customers that pay utility bills via credit card, debit card, or ACH bank payment.

For the foregoing reasons, continuation of the Cash Management System is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties in interest in these Chapter 11 Cases and should be authorized as requested herein.

### B. Continued Performance of Intercompany Transactions Is Warranted

As described above, the Cash Management System is similar to those commonly employed by other large corporate enterprises in which transfers between related entities are tracked as Intercompany Transactions. At any point in time, there may be outstanding amounts due and owing between the Debtors themselves as well as between the Debtors and their Non-Debtor Affiliates and Subsidiaries, all of which are recorded and documented as Intercompany Transactions.

As set forth above, under section 363(c)(1) of the Bankruptcy Code, a debtor in possession "may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business . . . and may use property of the estate in the ordinary course of business without notice or a hearing." The Debtors believe that they do not require the Court's approval to continue entering into and performing under the Intercompany Transactions. The Debtors enter into and perform under Intercompany Transactions "in the ordinary course of business" within the meaning of section

Case 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 27 of 35

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

363(c)(1). Furthermore, as stated above, transfers that take place pursuant to the PG&E Corp. CSA are subject to CPUC oversight. The Intercompany Transactions between PG&E Corp. and the Utility are integral to their ongoing operations and to providing reliable utility services to their customers. As previously stated, the Intercompany Transactions between the Debtors and the Non-Debtor Affiliates and Subsidiaries are relatively *de minimis*.

In addition, prepetition payments of amount owing with respect to StanPac, the Gill Ranch Project, and the Joint Infrastructure Projects will assure the ongoing operation of those ventures, that the Debtors continue to receive certain basic services on an uninterrupted basis, and allow the Debtors to maintain their investment in such ventures. The Debtors also intend to continue making all post Petition Date payments relating to those ventures in the ordinary course of business.

**C.    Maintenance of the Debtors' Existing Bank Accounts and Business Forms is Warranted**

The UST Guidelines generally require that a chapter 11 debtor, among other things: (i) establish debtor-in-possession accounts for all estate monies required for the payment of taxes (including payroll taxes); (ii) close all existing bank accounts and open new debtor-in-possession accounts at banks that are designated as "authorized depositories" by the U.S. Trustee; (iii) obtain checks that bear the designation "Debtor-in-Possession"; and (iv) reference the debtor's bankruptcy case number and type of account on each such check. These requirements are designed to establish a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against a debtor's inadvertent payment of prepetition claims by preventing banks from honoring checks drawn before the commencement of a debtor's chapter 11 case.

In these Chapter 11 Cases, strict enforcement of the UST Guidelines would severely disrupt the Debtors' ordinary financial operations by reducing efficiencies, increasing administrative burdens, and creating unnecessary expenses. As stated, the Debtors maintain approximately 108 Bank Accounts as part of the Cash Management System. If the Debtors were required to close these Bank Accounts and open new debtor-in-possession accounts, the Debtors would be forced to reconstruct the Cash Management System in its entirety. This reconstruction would be impractical and cost prohibitive in an enterprise like the Debtors. B&MM, including accounting and bookkeeping employees, would need to focus their efforts on immediately opening new bank accounts and working to establish proper cash

Case: 19-30089    Doc# 7    Filed: 01/29/19    Entered: 01/29/19 00:37:02    Page 28 of 35

flow controls, thereby diverting them from their daily responsibilities during this critical juncture of the Debtors' Chapter 11 Cases. Many accounts could not be replaced in time to effectively continue the Debtors' businesses. Even if possible, the opening of new bank accounts would increase operating costs, and the delays that would result from opening new accounts, revising cash management procedures, and redirecting payments would negatively impact the Debtors' ability to operate their business while establishing these new arrangements, to the detriment of all parties in interest.

The Debtors believe that their transition into chapter 11 will be significantly smoother and more orderly, with minimum disruption and harm to the Debtors' operations, if the Bank Accounts are continued following the Petition Date with the same account numbers. By preserving business continuity and avoiding the disruption and delay to the Debtors' collection and disbursement procedures that would necessarily result from closing the Bank Accounts and opening new accounts, all parties in interest, including employees, vendors, customers, and creditors will be best served. The confusion that would otherwise result, absent the relief requested herein, would ill-serve the Debtors' rehabilitative efforts. Accordingly, the Debtors respectfully request authority to maintain the Bank Accounts in the ordinary course of business.

In the ordinary course of business, the Debtors conduct transactions by debit, wire, ACH, and other similar methods. Certain of the Debtors' customers pay the Debtors through ACH or wire transfer, and the Debtors pay a majority of their third-party vendors and service providers through ACH or wire transfer. Accordingly, to avoid any disruption or claims against the Debtors, the Debtors are seeking to continue their prepetition debit, wire, and ACH practices during the Chapter 11 Cases.

Although the Debtors request that they be allowed to maintain their prepetition Bank Accounts, the Banks at which such accounts are kept must adhere to certain guidelines. Specifically, unless otherwise ordered by this Court, no Bank shall honor or pay any check issued on account of a prepetition claim. The Banks may honor any checks issued on account of prepetition claims only where this Court has specifically authorized such checks to be honored. Furthermore, the Debtors request that the Banks be authorized to accept and honor all representations from the Debtors as to which checks should be honored or dishonored consistent with any order(s) of this Court, whether or not the checks are dated prior to, on, or subsequent to the Petition Date. The Banks shall not be liable

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

to any party on account of following the Debtors' instructions or representations regarding which checks should be honored. Should any Bank honor a prepetition check, draft, wire transfer, ACH transfer or other debit drawn on a Bank Account (a) at the direction of the Debtors to honor such prepetition check or item, (b) in a good faith belief that the Court has authorized such prepetition item to be honored, (c) as a result of an innocent mistake made despite the implementation of customary item handling procedures, or (d) consistent with its past practices under the Cash Management System, such Bank shall not be deemed to be, nor shall be, liable to the Debtors or their estates or otherwise in violation of the Proposed Interim Order. Further, the Debtors request that the Banks shall have no liability for any operational processing errors that are the result of human error.

To minimize expenses, the Debtors should also be permitted to maintain and continue to use their Business Forms substantially in the forms existing immediately before the Petition Date. Strict compliance with the UST Guidelines, which require reprinting such documents, would unnecessarily increase the Debtors' expenses and would risk confusing the Debtors' customers, suppliers, and employees. Accordingly, the Debtors believe it is appropriate to continue to use all Business Forms as such forms were in existence prior to the commencement of these Chapter 11 Cases, without any reference to the Debtors' current status as debtors in possession.

In short, any benefits of the Debtors' strict compliance with the UST Guidelines would be far outweighed by the resulting expense, inefficiency, and disruption to the Debtors' business. Accordingly, the Debtors request authority to maintain their Bank Accounts and Business Forms during the Chapter 11 Cases. Furthermore, the Debtors seek a waiver of the UST Guidelines to the extent that requirements outlined therein otherwise conflict with (i) the Debtors' existing practices under the Cash Management System, (ii) any action taken by the Debtors in accordance with the Proposed Interim Order, or (iii) any other order entered in these Chapter 11 Cases.

### D. Waiver of the Requirements of Section 345(b) of the Bankruptcy Code Is Warranted

Section 345(a) of the Bankruptcy Code governs a debtor's deposit and investment of cash during a chapter 11 case and authorizes such deposits or investments as "will yield the maximum reasonable net return on such money, taking into account the safety of such deposit or investment." 11

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 30 of 35

U.S.C. § 345(a). For deposits or investments that are not "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States," section 345(b) of the Bankruptcy Code requires that the debtor obtain from the "entity with which the money is deposited or invested a bond in favor of the United States [that is] secured by the undertaking of a[n adequate] corporate surety . . . unless the court for cause orders otherwise. 11 U.S.C. § 345(b).[4]

In chapter 11 cases such as these, strict adherence to the requirements of section 345(b) of the Bankruptcy Code would be inconsistent with the value-maximizing purpose of chapter 11 by unduly hampering a debtor's ability under section 345(a) to invest money such "as will yield the maximum reasonable net return on such money." As a result, in 1994, to avoid "needlessly handcuff[ing] larger, more sophisticated debtors," Congress amended section 345(b) to provide that its strict investment requirements may be waived or modified if the court so orders "for cause." 140 Cong. Rec. H. 10,767 (Oct. 4, 1994). Here, the Debtors satisfy both the procedural and substantive requirements necessary to obtain a waiver of section 345(b) of the Bankruptcy Code.

First, as set forth above, twenty-one of the thirty Primary Bank Accounts are maintained at banks that have been approved by the U.S. Trustee as "authorized depositories" in accordance with the UST Guidelines. Although BNYM and RBC are not U.S. Trustee-designated authorized depositories, BNYM is a highly rated, nationally chartered bank, and both are subject to supervision by national banking regulators. BNYM is the world's largest custodian bank and asset servicing company with $1.9 trillion in assets under management and $33.3 trillion in assets under custody as of December 2017. RBC holds consolidated assets of over $832 billion, operates in 44 countries, and has been approved as a qualifying foreign banking organization by the Federal Reserve Board, thereby subjecting it to the same comprehensive regulatory regime that governs the operations of U.S. domestic banking entities. To the extent that the accounts at RBC and BNYM are not in technical compliance with the requirements of section 345, the Debtors seek to have such requirements waived so as to allow

---

[4] In the alternative, the estate may require such entity to deposit governmental securities pursuant to 31 U.S.C. § 9303, which provides that when a person is required by law to give a surety bond, that person, in lieu of a surety bond, may instead provide an eligible obligation, designated by the Secretary of the Treasury, as an acceptable substitute for a surety bond. 31 U.S.C. § 9303(a).

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

DEBTORS' MOTION TO CONTINUE CASH
MANAGEMENT SYSTEM

31

BNYM and RBC to accept and hold cash in accordance with the Debtors' prepetition practices. Furthermore, the Short-Term Investment Policy, as modified by the Debtors, is in compliance with section 345(b) as the modified Short-Term Investment Policy limits investments to those that are either "insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States or backed by the full faith and credit of the United States."

Moreover, there is cause to warrant a waiver of the requirements of section 345(b) of the Bankruptcy Code. Courts consider the "totality of the circumstances" in determining whether "cause" exists, with particular regard to the following factors:

a) The sophistication of the debtor's business;

b) The size of the debtor's business operations;

c) The amount of investments involved;

d) The bank ratings (Moody's and Standard and Poor) of the financial institutions where debtor in possession funds are held;

e) The complexity of the case;

f) The safeguards in place within the debtor's own business of insuring the safety of the funds;

g) The debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

h) The benefit to the debtor;

i) The harm, if any, to the estate; and

j) The reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case.

*In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).

Here, "cause" exists because, among other things: (i) all of the Banks holding significant balances are highly rated, reputable banks that are subject to supervision by national banking regulators; (ii) the Debtors retain the right to close accounts with the Banks and establish new bank accounts as needed; (iii) the cost associated with satisfying the requirements of section 345(b) is needlessly burdensome to the Debtors and their estates; and (iv) the process of satisfying such

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 32 of 35

requirements would lead to needless inconvenience and inefficiencies in the management of the Debtors' business. The benefits of a waiver would far outweigh any potential harm to the estates from noncompliance with section 345(b). The complex nature of the Debtors' businesses requires numerous bank accounts. Moreover, a bond secured by the undertaking of a corporate surety would be prohibitively expensive (if such a bond could be obtained at all). Furthermore, based on its experience opening new bank accounts, the Debtors estimate that it would take months to create a new suite of bank accounts to service their business. The Debtors submit that the costs of disruption to the business by having to close dozens of accounts far outweighs the risks of the Debtors continuing to maintain their historic Bank Accounts during the administration of the Chapter 11 Cases. Accordingly, the Court should waive the requirements of section 345(b) in these Chapter 11 Cases on a final basis. However, if the U.S. Trustee needs additional time to consider the waiver, in the alternative, the Court should, on an interim basis, extend the Debtors' time to comply with the requirements of section 345(b) of the Bankruptcy Code for sixty (60) days while the Debtors discuss the issue with the U.S. Trustee and any statutory committees appointed in these Chapter 11 Cases.

## V. RESERVATION OF RIGHTS

Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## VI. IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003

Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. As described herein and in the Wells Declaration, the Debtors' business operations rely

Case 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 33 of 35

heavily on the Debtors' Cash Management System, Bank Accounts, and Business Forms. Any disruption in the continuation of these practices would severely disrupt the Debtors' operations to the detriment and prejudice of all parties in interest. Accordingly, the Debtors have satisfied the requirements for immediate entry of an order granting the relief requested herein pursuant to Bankruptcy Rule 6003.

## VII.  REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h). As explained above and in the Wells Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## VIII.  NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (ii) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Office of the California Attorney General; (vi) the California Public Utilities Commission; (vii) the Nuclear Regulatory Commission; (viii) the Federal Energy Regulatory Commission; (ix) the Office of the United States Attorney for the Northern District of California; (x) the Banks; (xi) counsel for the agent under the Debtors' proposed debtor in possession financing facilities; and (xii) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002. Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30089   Doc# 7   Filed: 01/29/19   Entered: 01/29/19 00:37:02   Page 34 of 35

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 29, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By: _/s/ Tobias S. Keller_
      Tobias S. Keller

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30089    Doc# 7    Filed: 01/29/19    Entered: 01/29/19 00:37:02    Page 35 of 35