WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice* pending)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice* pending)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice* pending)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>                   **Debtor.**<br><br>Tax I.D. No. 94-3234914 | Case Nos. 19 -_____ (___)<br>            19 -_____ (___)<br><br>Chapter 11<br><br>**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105(a), 362(d), 363(b), 363(c), AND 364 AND FED. R. BANKR. P. 4001, 6003, AND 6004 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO MAINTAIN INSURANCE POLICIES, WORKERS' COMPENSATION PROGRAM, AND SURETY BOND PROGRAM AND PAY ALL OBLIGATIONS WITH RESPECT THERETO; AND (II) GRANTING RELIEF FROM THE AUTOMATIC STAY WITH RESPECT TO WORKERS' COMPENSATION CLAIMS** |
| In re:<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>                   **Debtor.**<br><br>Tax I.D. No. 94-0742640 | Date:<br>Time:<br>Place: |

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105(a), 362(d), 363(b), 363(c), and 364 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 4001, 6003, and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for interim and final authority to (i) (a) maintain their Insurance Policies, Workers' Compensation Program, and Surety Bond Program (each as defined below) in accordance with their prepetition practices and pursuant to the policies and agreements related thereto, and perform their obligations with respect to the foregoing during these Chapter 11 Cases, and (b) pay any prepetition obligations arising under the Insurance Policies, Workers' Compensation Program, and Surety Bond Program; and (ii) modify the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program, and for related relief. The Debtors further request that the Court authorize, but not direct, applicable banks and financial institutions (the "**Banks**") to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic fund transfers requested or to be requested by the Debtors relating to the Insurance Obligations, the Workers' Compensation Program, the Surety Bond Obligations, and the Service Provider Fees (each as defined below).

A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").

# TABLE OF CONTENTS

**Page**

I.       JURISDICTION ...........................................................................7

II.      BACKGROUND ...........................................................................7

III.     THE DEBTORS' INSURANCE POLICIES AND WORKERS'
         COMPENSATION PROGRAM ....................................................7

         A.      The Workers' Compensation Program .................................8

         B.      Insurance Policies .................................................................9

         C.      The Debtors' Surety Bond Program ...................................10

         D.      The Debtors' Insurance Service Providers .........................12

IV.      BASIS FOR RELIEF REQUESTED ...........................................13

         A.      Maintaining the Insurance Policies and the Workers' Compensation ...............13

         B.      Payments Made in Connection With the Insurance Policies, the
                 Workers' ..............................................................................14

         C.      Continuation of Payments With Respect to the Insurance Policies, the
                 Workers' Compensation Program, and the Surety Bond Program, and
                 Payment of Any Related Obligations Is Necessary to Protect and
                 Preserve the Debtors' Estate ...............................................14

         D.      The Automatic Stay Should Be Modified for Workers' Compensation
                 Claims ..................................................................................19

         E.      Applicable Banks Should Be Authorized to Receive, Process, Honor,
                 and Pay Checks Issued and Transfers Requested on Account of the
                 Insurance Obligations, Workers' Compensation Claims, and Surety
                 Bond Obligations .................................................................20

V.       RESERVATION OF RIGHTS .....................................................20

VI.      IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY
         RULE 6003 ...............................................................................20

VII.     REQUEST FOR BANKRUPTCY RULE 6004 WAIVER ...........21

VIII.    NOTICE......................................................................................21

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **TABLE OF AUTHORITIES**

**Cases**                                                                                     **Page(s)**

*In re Adams Apple, Inc.*,
    829 F.2d 1484 (9th Cir. 1987) ................................................................... 17

*In re All American Home Center, Inc.*,
    Case No. 11-52283-ER (Bankr. C.D. Cal. October 24, 2011).................... 18

*In re Anchorage Nautical Tours, Inc.*,
    145 B.R. 637 (B.A.P. 9th Cir. 1992)............................................................ 15

*In Matter of B & W Enterprises, Inc.*,
    713 F.2d 534 (9th Cir. 1983) ................................................................ 16, 17

*Berg & Berg Enterprises, LLC v. Boyle*,
    178 Cal. App. 4th 1020 (2009) .................................................................... 15

*In re Chateaugay Corp.*,
    80 B.R. 279 (S.D.N.Y. 1987)........................................................................ 17

*Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville
    Corp.)*,
    60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)................................................... 15

*In re Curry & Sorensen, Inc.*,
    57 B.R. 824 (B.A.P. 9th Cir. 1986)............................................................... 16

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017)..................................................................................... 16

*In re Eagle–Picher Indus., Inc.*,
    124 B.R. 1021 (Bankr. S.D. Ohio 1991)...................................................... 16

*F.D.I.C. v. Castetter*,
    184 F.3d 1040 (9th Cir. 1999) ..................................................................... 15

*In re Financial News Network, Inc.*
    134 B.R. 732 (Bankr. S.D.N.Y. 1991)......................................................... 16

*Gordon v. Hines (In re Hines)*,
    147 F.3d 1185 (9th Cir. 1998) ..................................................................... 17

*In re Gulf Air*,
    112 B.R. 152 (Bankr. W.D. La. 1989).......................................................... 17

*In re Ionosphere Clubs, Inc.*,
    98 B.R. 174 (Bankr. S.D.N.Y. 1989)............................................................ 15

*In re Just For Feet, Inc.*,
    242 B.R. 821 (D. Del. 1999) ........................................................................ 16

*Miltenberger v. Logansport, C&S W.R. Co.*,
    106 U.S. 286 (1882) ................................................................................... 16

*In re NTD Architects, Inc.*,
    Case No. 16883-BR (Bankr. C.D. Cal. May 8, 2014) ................................ 18

*In re NVR L.P.*,
    147 B.R. 126 (Bankr. E.D. Va. 1992) ........................................................ 16

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,
    147 B.R. 650 (S.D.N.Y. 1992) ................................................................... 15

*In re Pettit Oil Co.*,
    No. 13-47285, 2015 WL 6684225 (Bankr. W.D. Wash. Oct. 22, 2015) ......... 17

*Scouler & Co., LLC v. Schwartz*,
    No. 11-CV-06377 NC, 2012 WL 1502762 (N.D. Cal. Apr. 23, 2012) ........... 15

*In re Solid Landing Behavioral Health, Inc.*,
    Case No. 17-12213 (Bankr. C.D. Cal. June 30, 2017) ............................... 18

*In re Structurlite Plastics Corp.*,
    86 B.R. 922 (Bankr. S.D. Ohio 1988) ........................................................ 17

**Statutes**

11 U.S.C. § 105 ............................................................................. 14, 15, 17

11 U.S.C. § 362 .................................................................................... 2, 19

11 U.S.C. § 363 ............................................................................... 2, 14, 15

11 U.S.C. § 364 .................................................................................... 2, 14

11 U.S.C. § 365 ......................................................................................... 20

11 U.S.C. § 1107(a) .............................................................................. 7, 15

11 U.S.C. § 1108 ........................................................................................ 7

11 U.S.C. § 1112(b)(4)(C) ........................................................................ 13

28 U.S.C. § 157 .......................................................................................... 7

28 U.S.C. § 1334 ........................................................................................ 7

28 U.S.C. § 1408 ........................................................................................ 7

Case 19-10089    Doc# 9    Filed: 01/29/19    Entered: 01/29/19 00:48:22    Page 5 of 22

| | |
|---|---|
| 28 U.S.C. § 1409 | 7 |
| 33 U.S.C. § 901 | 9 |
| 33 U.S.C. § 950 | 9 |
| California Labor Code § 3700 | 8 |
| California Labor Code § 3823 | 8 |

**Other Authorities**

| | |
|---|---|
| B.L.R. § 2015-1(a) | 17 |
| Fed. R. Bankr. P. 2002 | 21 |
| Fed. R. Bankr. P. 4001 | 2, 19 |
| Fed. R. Bankr. P. 6003 | 2, 20, 21 |
| Fed. R. Bankr. P. 6004 | 2, 21 |

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*,
    General Order 24 (N.D. Cal.) .......... 7

Case: 18-30089    Doc# 9    Filed: 01/29/19    Entered: 01/29/19 00:48:22    Page 6 of 22

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the Northern District of California (the "**Bankruptcy Local Rules**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### II.     BACKGROUND

On the date hereof (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in either of these Chapter 11 Cases.

Additional information regarding the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the Declaration of Jason P. Wells, Senior Vice President and Chief Financial Officer of PG&E Corp., filed contemporaneously herewith in support of the Debtors' chapter 11 petitions and related first day relief (the "**Wells Declaration**").

### III.     THE DEBTORS' INSURANCE POLICIES AND WORKERS' COMPENSATION PROGRAM

In the ordinary course of their operations, including the transmission and distribution of natural gas and electricity to the Debtors' commercial and retail customers and operating and maintaining power generation and storage facilities, the Debtors maintain a workers' compensation program (the "**Workers' Compensation Program**") and various liability, property, and other insurance arrangements (collectively, the "**Insurance Policies**," and all premiums and other obligations related thereto, including any broker or advisor fees, associated federal excise taxes and state taxes, other fees, and deductibles, collectively, the "**Insurance Obligations**") through several insurance carriers (each, an "**Insurer**").  Certain of the Insurance Policies, including the Debtors' nuclear property liability policies, provide unique coverage or terms and it would be difficult for the Debtors to obtain replacement policies

in the market. A list of the Insurance Policies is annexed hereto as **Exhibit B**.[1] A description of the Workers Compensation Program and the various Insurance Policies is set forth below.

### A. The Workers' Compensation Program

California Labor Code §§ 3700-3823 mandate that the Debtors provide for payment of all injury claims suffered by the Debtors' employees arising out of the course and scope of their employment (the "**Workers' Compensation Claims**"), either by obtaining third-party insurance or obtaining a certificate to self-insure from the California Department of Industrial Relations. The Workers' Compensation Program covers, among other things, workers' compensation and employer liability for accidents, death, or disease sustained by employees. The Debtors generally self-insure Workers' Compensation Claims and the annual cost of administering the Workers' Compensation Program, including labor costs, medical payments, and costs associated with the investigation of claims, medical records, examinations and bills, is approximately $10.2 million. This does not encompass the payment of any Workers' Compensation Claims.

To maintain the Workers' Compensation Program, the Debtors are required to participate in the California Self-Insurers' Security Fund (the "**CSISF**"), which covers workers' compensation claims when self-insured companies default on their obligations. The CSISF also has the right to require that participants provide cash or other collateral (the "**Collateral**") to secure their obligations if they default. To participate in the CSISF for the period July 1, 2018 through June 30, 2019, the Debtors paid an annual fee of approximately $750,000 on July 14, 2018. The Debtors also are subject to an annual assessment of approximately $1,500,000, paid to the California State Division of Workers' Compensation to cover costs associated with administering the CSISF. The Debtors paid this annual assessment on December 18, 2018 for the period July 1, 2018 through June 30, 2019. The Debtors' Workers' Compensation Program also includes coverage for certain employees (the "**LHW Employees**") protected under the

---

[1] The Debtors have made an extensive and good-faith effort to identify all of their Insurance Policies and Insurers on **Exhibit B**. However, due to the size and complexity of the Debtors' operations, certain Insurance Policies and Insurers may not be listed therein. Accordingly, **Exhibit B** is a non-exhaustive list of the Debtors' Insurance Policies. Further, the Debtors may, in the future, enter into new Insurance Policies. To the extent that the Debtors identify additional Insurance Policies not listed on **Exhibit B**, or enter into new Insurance Policies, the Debtors seek the authority to continue such Insurance Policies uninterrupted and honor, in the Debtors' discretion, all Insurance Obligations relating thereto.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Longshore and Harbor Workers' Compensation Act (the "**LHWCA**"), 33 U.S.C. §§ 901–950. Pursuant to the LHWCA, the Debtors posted collateral in the form of two evergreen letters of credit in the amounts of $800,000 and $300,000 (the "**LHWCA LOCs**"), respectively, with the United States Department of Labor.

Although the Debtors generally self-insure and self-administer all Workers' Compensation Claims under their Workers' Compensation Program, the Debtors also obtain third-party insurance in connection with (i) their employees working outside of California through Employers Insurance Company of Wausau, with an annual policy premium of approximately $9,000 (the "**Wausau Policy**"), and (ii) claims that exceed $10 million per occurrence through AEGIS Insurance Services, Inc., with an annual premium of approximately $230,000 (the "**AEGIS Policy**"). As of the Petition Date, there are no outstanding premiums due under the Wausau Policy or the AEGIS Policy.

In the ordinary course of business, because the Debtors are largely self-insured, the Debtors may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives. As of the Petition Date, the Debtors estimate that there were approximately 7,700 open claims under the Workers' Compensation Program. The Debtors estimate that they pay an average of approximately $2.9 million per month on account of Workers' Compensation Claims. The Debtors seek authority to maintain the Workers' Compensation Program in the ordinary course of business and to pay all prepetition amounts related to the Workers' Compensation Program as well as amounts that may become due and owing with respect to the Workers' Compensation Program during these Chapter 11 Cases. The Debtors also seek authority to provide Collateral to the CSISF to the extent required.

**B.      Insurance Policies**

The Debtors maintain various liability and property Insurance Policies which provide the Debtors with insurance coverage for general commercial claims, property damage, nuclear property liability claims, cyber liability claims, crime, pollution and environmental-related claims, collision and other liabilities arising from company-owned vehicles, claims relating to the administration of employee benefit plans and the Debtors' employment practices, directors' and officers' liability, and other property-related and general liabilities, as well as excess policies related to the same. The Debtors

maintain the Insurance Policies to, among other things, help manage the various risks associated with their electricity and natural gas business. Continuation of the Insurance Policies is essential to the ongoing operation of the Debtors' business.

Pursuant to each of the Insurance Policies, the Debtors are required to pay premiums based upon a fixed rate established and billed by each Insurer[2] in addition to covering applicable deductibles. The Insurance Policies each have an annual premium that is paid prospectively. The annual premiums for the Insurance Policies currently in effect aggregate to approximately $439,000,000. The Debtors are not aware of any outstanding premiums or other amounts owed to the various Insurers for the Insurance Policies.

### C.        The Debtors' Surety Bond Program

In the ordinary course of business, the Debtors are required to provide surety bonds (each, a "**Surety Bond**") to certain third parties, including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations (the "**Surety Bond Program**"). These include, among other things, Surety Bonds related to various construction and environmental remediation projects and related permits and/or or licenses, self-insurance obligations, lease agreements with the State of California, land maintenance obligations, and certain tax obligations. Often, statutes or ordinances require the Debtors to post the Surety Bonds. A list of Surety Bonds in the Surety Bond Program is attached as **Exhibit C**.[3] The Surety Bonds are issued by XL Specialty Insurance Company and Liberty Mutual Insurance Company and certain of its subsidiaries (each, a "**Surety**"). The Debtors

---

[2] The Debtors purchase certain of their Insurance Policies through a participation agreement with Energy Insurance Services, Inc. ("**EIS**"), a "sponsored captive insurer". Although EIS does not itself write any policies, EIS procures insurance coverage from third-party insurers, for the benefit of the Debtors, allowing the Debtors to take advantage of reinsurance markets (accessible to EIS but otherwise inaccessible to the Debtors), and thereby securing lower premiums and supplemental coverage that would otherwise be unavailable to the Debtors. With respect to Insurance Policies that are procured through EIS, the Debtors pay any related premiums directly to EIS.

[3] The Debtors have made an extensive and good-faith effort to identify all of their Surety Bonds on **Exhibit C**. However, due to the size and complexity of the Debtors' operations, all Surety Bonds and Sureties may not be listed therein. Accordingly, **Exhibit C** is a non-exhaustive list of the Debtors' Surety Bonds. Further, the Debtors may, in the future, obtain new Surety Bonds. To the extent that the Debtors identify additional Surety Bonds not listed on **Exhibit C** or obtain new Surety Bonds, the Debtors seek the authority to continue such Surety Bonds uninterrupted and honor, in the Debtors' discretion, all Surety Bond Obligations (as defined herein) relating thereto.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1  estimate that as of the Petition Date, the total face amount of all outstanding Surety Bonds is

2  approximately $166,000,000.

3  As a condition to issuing the Surety Bonds, the Sureties require the Debtors to enter into

4  indemnity agreements (collectively, the "**Surety Indemnity Agreements**"), pursuant to which the

5  Debtors indemnify the Sureties from any loss, cost, or expense that the Sureties may incur on account of

6  the issuance of the Surety Bonds on behalf of the Debtors (the "**Indemnity Obligations**"). Under the

7  terms of the Surety Indemnity Agreements, the Sureties may demand cash collateral or letters of credit

8  to secure the Indemnity Obligations at any point during the time the Surety Bonds remain outstanding.

9  As of the Petition Date, the Debtors have not posted any cash collateral or letters of credit in connection

10  with the Surety Indemnity Agreements. Just recently, however, Liberty Mutual, the Debtors' principal

11  Surety Bond provider, issued a notice of cancellation of certain Surety Bonds and a demand for security

12  in the form of a letter of credit in the amount of $50,000,000.

13  Pursuant to the Surety Bond Program, the Debtors pay premiums based upon a fixed rate

14  established and billed by each Surety thereunder (collectively, the "**Surety Premiums**" and, together

15  with the Indemnity Obligations, the "**Surety Bond Obligations**"). The Surety Premiums are generally

16  determined on an annual basis and total in the aggregate approximately $820,000 per year. The Debtors

17  remit Surety Premium payments when the bonds are issued or renewed, typically on an annual basis.

18  The Debtors are not aware of any Surety Premiums that are outstanding as of the Petition Date. In

19  addition, the Debtors are not aware of any Surety Bonds that have been drawn.

20  To continue their business operations during these Chapter 11 Cases, the Debtors must be able

21  to continue to provide financial and other assurances to state governments, regulatory agencies, and other

22  third parties in the form of Surety Bonds. This requires the Debtors to maintain their existing Surety

23  Bond Program, including the payment of Surety Bond Obligations as and when they come due, providing

24  the Sureties with collateral, if required, renewing or potentially acquiring additional bonding capacity as

25  needed in the ordinary course of their business, and executing other indemnity agreements, as needed,

26  in connection with the Surety Bond Program. Accordingly, approval of the relief requested herein with

27  respect to the Surety Bond Obligations is warranted and the Debtors should be authorized to maintain

28  and continue their Surety Bond Program and pay all Surety Bond Obligations, including, without

limitation, any Surety Bond Obligations related to the period prior to the Petition Date. It is important to note that substantially all, if not all, of the outstanding Surety Bonds were provided in connection with ongoing projects and other matters that the Debtors will continue in the ordinary course of their business and, accordingly, the Debtors do not expect that any outstanding Surety Bonds will be called upon. The Debtors also expect that if the relief sought in this Motion is granted, it should address the concerns raised by Liberty Mutual and result in a withdrawal of its notice of cancellation of the Surety Bonds.

### D. The Debtors' Insurance Service Providers

The Debtors employ brokers (the "**Brokers**"), including Marsh, LLC, Price Forbes & Partners, and Guy Carpenter & Company, LLC, to coordinate the procurement and negotiation of certain Insurance Policies including, but not limited to, those related to workers' compensation, directors' and officers' liability, fiduciary liability, general commercial liability, and first-party property liability policies. With respect to most of the Insurance Policies as to which the Brokers are involved, the Insurers charge the Brokers directly for all insurance premiums and other amounts due under such Insurance Policies. The Brokers then send the Debtors a statement for the payment of such insurance premiums, and, once paid by the Debtors, the Brokers submit the payments to the Insurers.[4] The Brokers receive a fee (the "**Broker Fees**") from the Debtors for administering certain of the Insurance Policies.

The Debtors also employ a third-party administrator (the "**Insurance Administrator**") to investigate, administer, and pay claims arising under their Insurance Policies. The Debtors pay fees for these services on a monthly basis (such fees, together with the Brokers' Fees, the "**Service Provider Fees**"). The Service Provider Fees are budgeted based on a flat fee and total approximately $5,500,000 each year.

Because the Brokers and Insurance Administrator are intimately familiar with the Debtors and the Insurance Policies, the Debtors request authority, but not direction, to pay any prepetition Service Providers' Fees that may be owed, including as a result of any future reconciliations, and to continue to honor all of their obligations to them in the ordinary course. Based on the information currently available, the Debtors are not aware of any Service Provider Fees that are owed with respect to the period

---

[4] With respect to Insurance Policies that are procured through EIS, the Debtors pay any related premiums directly to EIS and do not use Brokers.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

prior to the Petition Date.

## IV. BASIS FOR RELIEF REQUESTED

As set forth above, the Debtors request authority to continue maintaining their Insurance Policies, Workers' Compensation Program, and Surety Bond Program and honoring any obligations with respect thereto, including the payment of any Insurance Obligations, Workers' Compensation Claims, Surety Bond Obligations, and Service Provider Fees, regardless of whether such obligations arose or relate to the period prior to or after the Petition Date. While the Debtors are unaware of any current prepetition amounts due to the Insurers under the Insurance Policies or with respect to the Surety Bond Program, the Debtors seek authority to pay any such amounts that may arise and as to which they are unaware out of an abundance of caution. Additionally, the Debtors request authority to modify the automatic stay to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Programs.

### A. Maintaining the Insurance Policies and the Workers' Compensation Program is Required Under the Bankruptcy Code, the U.S. Trustee Operating Guidelines, and Other Applicable Law

Under section 1112(b)(4)(C) of the Bankruptcy Code, "failure to maintain appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C). In addition, in many instances, the coverage provided under the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the operating guidelines issued by the Office of the United States Trustee for Region 17, which includes the Northern District of California (the "**U.S. Trustee Guidelines**"). Moreover, California state law requires the Debtors to maintain the Workers' Compensation Program. Given this backdrop, it is essential to the Debtors' estates and consistent with the Bankruptcy Code, the U.S. Trustee Guidelines, and California state law that the Debtors be permitted to maintain and continue making all payments required with respect to their Insurance Policies and the Workers' Compensation Program. It is similarly critical that the Debtors have the authority to supplement, amend, extend, renew, or replace their Insurance Policies as needed, in their business judgment, without further order of the Court.

Case: 19-30089    Doc# 9    Filed: 01/29/19    Entered: 01/29/19 00:48:22    Page 13 of 22

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**B.      Payments Made in Connection With the Insurance Policies, the Workers' Compensation Program, and the Surety Bond Program Are Authorized Pursuant to Sections 363 and 364 of the Bankruptcy Code**

The Debtors believe that payments made in connection with the Insurance Policies, the Workers' Compensation Program, and the Surety Bond Program, as well as the payment of any Insurance Obligations, Workers' Compensation Claims, Surety Bond Obligations, and Service Provider Fees in connection therewith (other than certain prepetition amounts addressed below), fall within the ordinary course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code. Additionally, with respect to the Workers' Compensation Program and the Surety Bond Program, to the extent cash or other collateral is required, authority to provide the same is authorized and appropriate pursuant to section 364(c) of the Bankruptcy Code.

Here, maintaining the Insurance Policies, the Workers' Compensation Program, and the Surety Bond Program, and honoring the obligations with respect thereto, including undertaking renewals of the Insurance Policies and the Surety Bonds as they expire or entering into new insurance arrangements or surety and indemnity agreements, are not only essential to ongoing operations, but also are the type of ordinary course transactions contemplated by section 363(c)(1) or otherwise satisfy the requirements of section 364(c) of the Bankruptcy Code.

**C.      Continuation of Payments With Respect to the Insurance Policies, the Workers' Compensation Program, and the Surety Bond Program, and Payment of Any Related Obligations Is Necessary to Protect and Preserve the Debtors' Estate**

As set forth above, the Debtors believe that the maintenance and continuation of the Insurance Policies, the Workers' Compensation Program, and the Surety Bond Program, as well as the payment of any Insurance Obligations, Workers' Compensation Claims, Surety Bond Obligations, and Service Provider Fees in connection therewith, are largely ordinary course of business matters and transactions and, therefore, are authorized pursuant to section 363(c)(1) of the Bankruptcy Code.  To the extent that any of the foregoing do not constitute ordinary course transactions, however, the Debtors request the Court authorize the Debtors to continue and make payments with respect to the Insurance Policies, the Workers' Compensation Program, and Surety Bond Program, as well as to pay any prepetition amounts with respect thereto, pursuant to sections 105(a), and 363(b) of the Bankruptcy Code.

Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under section 363 of the Bankruptcy Code, a court may authorize a debtor to pay certain prepetition claims where a sound business purposes exists for doing so. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). The business judgment rule is satisfied where "the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See, e.g., Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.),* 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)); *see also F.D.I.C. v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999) (the business judgment rule "requires directors to perform their duties in good faith and as an ordinarily prudent person in a like circumstance would"). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Courts construing California law have consistently declined to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and have upheld a board's decisions as long as such decisions were made in good faith. *Scouler & Co., LLC v. Schwartz*, No. 11-CV-06377 NC, 2012 WL 1502762, at *4 (N.D. Cal. Apr. 23, 2012*); Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal. App. 4th 1020, 1046 (2009).

The Court may also rely on its equitable powers under section 105 of the Bankruptcy Code to grant the relief requested in this Motion. Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Accordingly, the Court may authorize the Debtors to continue and make payments with respect to the Insurance Policies, the Workers' Compensation Program, and Surety Bond Program, as well as to pay any prepetition amounts with respect thereto, because such relief is necessary for the Debtors to carry out their fiduciary duties under sections 1107(a) of the Bankruptcy Code. Under section 1107(a) of the Bankruptcy Code "the debtor in possession has the same fiduciary duties and liabilities as a Trustee. When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors." *In re Anchorage*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1    *Nautical Tours, Inc.*, 145 B.R. 637, 643 (B.A.P. 9th Cir. 1992); *see also In re Curry & Sorensen, Inc.*,

2    57 B.R. 824, 828 (B.A.P. 9th Cir. 1986) ("[T]he debtor's directors bear essentially the same fiduciary

3    obligation to creditors and shareholders as would a trustee for a debtor out of possession").

4        Numerous Courts have acknowledged that payment of prepetition obligations, irrespective of

5    statutory priorities, may be necessary to realize the objectives of the Bankruptcy Code, such as the

6    preservation and enhancement of the value of a debtor's estate for the benefit of all creditors and other

7    stakeholders. *See, e.g., Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts

8    have approved distributions that are not consistent with ordinary priority rules in instances where

9    significant Code-related objectives, such as enabling a successful reorganization, would be served and

10    listing examples such as "first-day wage orders that allow payment of employees' prepetition wages,

11    critical vendor orders that allow payment of essential suppliers' prepetition invoices, and roll-ups that

12    allow lenders who continue financing the debtor to be paid first on their prepetition claims");

13    *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership

14    claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business

15    relations"); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (allowing payment of prepetition

16    claim because debtor could not survive without maintaining customer relationship); *In re Financial News

17    Network, Inc.* 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991) (payment of prepetition claims allowed if

18    "critical to the debtor's reorganization"); *In re NVR L.P.*, 147 B.R. 126, 128 (Bankr. E.D. Va. 1992)

19    (holding that "proponent of the payment must show substantial necessity"); *In re Eagle–Picher Indus.,

20    Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that payment must be "necessary to avert a

21    serious threat to the chapter 11 process").

22        Although there is a Ninth Circuit decision which fails to recognize the grant of authority given

23    by the Bankruptcy Code to elevate certain pre-petition payments over others, that case is easily

24    distinguishable from these Chapter 11 Cases and the relief sought herein, as the pre-petition payments

25    at issue there were made by the debtor without notice, hearing, or authorization from the Bankruptcy

26    Court. *In Matter of B & W Enterprises, Inc.*, 713 F.2d 534, 535 (9th Cir. 1983). Furthermore, although

27    the *B & W* court noted that the "necessity of payment" doctrine was established in railroad reorganization

28    cases, *id.* at 535, numerous courts have extended the doctrine beyond the railroad reorganization context.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

*See, e.g., In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately"); *In re Gulf Air*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (finding that payment of prepetition wage and benefit obligations was in the best interest of creditors and necessary for the successful reorganization of the debtor and granting the debtor's motion to pay prepetition employee expenses); *In re Chateaugay Corp.*, 80 B.R. 279, 285 (S.D.N.Y. 1987) (finding that bankruptcy courts have the authority to authorize the debtor to pay certain prepetition claims).

Moreover, since *B & W*, the Ninth Circuit has noted in other instances that certain pre-petition payments should be authorized regardless of whether they are priority payments under the Bankruptcy Code. *See In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987). In that case, in rejecting the appellants' argument that the cross-collateralization clause in a financing agreement violated the "fundamental tenet of bankruptcy law that like creditors must be treated alike," the Court of Appeals noted that the argument was "flawed because the fundamental tenet conflicts with another fundamental tenet – rehabilitation of debtors, which may supersede the policy of equal treatment." *Id*. The Ninth Circuit further stated that:

> [c]ases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts.

*Id*.

Numerous Courts within the Ninth Circuit have followed the reasoning of *In re Adams Apple* in holding that the payment of certain pre-petition claims is not categorically barred when the payments promote the rehabilitation of the debtor. *See, e.g., In re Pettit Oil Co.*, No. 13-47285, 2015 WL 6684225, at *8 (Bankr. W.D. Wash. Oct. 22, 2015) (citing *In re Adams Apple Inc.* for proposition that it "is permissible to treat prepetition debts unequally when necessary for rehabilitation."); *Gordon v. Hines (In re Hines)*, 147 F.3d 1185, 1191 (9th Cir. 1998) (applying "essentially a doctrine of necessity" to provide for the payment of the fees of debtor's counsel in chapter 7 cases because without this right the

Case 19-30089   Doc# 9   Filed: 01/29/19   Entered: 01/29/19 00:48:22   Page 17 of 22

"entire [chapter 7] system would suffer a massive breakdown"). Furthermore, several courts within this Circuit have granted relief substantially similar to that sought herein. *See, e.g., In re Solid Landing Behavioral Health, Inc.*, Case No. 17-12213 (Bankr. C.D. Cal. June 30, 2017) (approving motion for authority to maintain pre-petition insurance programs and pay related premiums and broker's fees); *In re NTD Architects, Inc.*, Case No. 16883-BR (Bankr. C.D. Cal. May 8, 2014) (same); *In re All American Home Center, Inc.*, Case No. 11-52283-ER (Bankr. C.D. Cal. October 24, 2011) (approving motion for authority to maintain pre-petition insurance programs and pay related premiums).

In light of the risks applicable to the Debtors' operations and the critical need for the Debtors to protect their assets and operations from such risks and to provide Surety Bonds as required, it is essential that the Debtors maintain the Insurance Policies, and the Surety Bond Program and pay all Insurance Obligations, Surety Bond Obligations, and Service Provider Fees during the course of these Chapter 11 Cases. Without authority to maintain and pay amounts owing in connection with these programs, the ability of the Debtors to conduct operations in many locations could come to a halt to the detriment and prejudice of all parties in interest. Additionally, based on the Debtors' current circumstances, it is not likely that the Debtors will be able to renew or replace their existing Insurance Policies or Surety Bonds on terms more favorable than those currently offered by the Insurers and Sureties. The process of establishing new programs would also be burdensome and costly to the Debtors. Additionally, the relief sought herein will avoid the risk of any potential disruption of necessary coverage and the Debtors' potential exposure to significant liability and to fines under various applicable federal and state laws and regulations. Furthermore, the Debtors must maintain the Insurance Policies to comply with the U.S. Trustee Guidelines. In addition, because of the Insurance Service Providers' intimate familiarity with the Debtors and the Insurance Policies, the Debtors should be authorized to pay any prepetition Service Providers Fees that may be owed to the Insurance Service Providers, including as a result of any future reconciliations, and to continue to honor all of their obligations to them.

It also is essential that the Debtors maintain and continue all payments under the Workers' Compensation Program and proceed in the normal course with all Workers' Compensation Claims. In addition to being mandated by applicable law, the Workers' Compensation Program provides customary and necessary benefits to assure that employees who are injured while working are treated fairly and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

appropriately.

Based on the foregoing, the Court should authorize the Debtors, as a prudent and sound exercise of the Debtors' business judgment, to (a) maintain all of their Insurance Policies, the Workers' Compensation Program, and the Surety Bond Program, and (b) pay all Insurance Obligations, Workers' Compensation Claims, Surety Bond Obligations, and Service Providers Fees, including any prepetition obligations, in the ordinary course as they come due.

**D.      The Automatic Stay Should Be Modified for Workers' Compensation Claims**

Section 362(a) of the Bankruptcy Code operates to stay:

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(d). Section 362(d), however, permits a debtor or other party in interest to request a modification or termination of the automatic stay for "cause."

To the extent the Debtors' employees hold claims under the Workers' Compensation Program, the Debtors seek authority under section 362(d) to permit, in the Debtors' sole discretion, those employees to proceed with their Workers' Compensation Claims, in the appropriate judicial or administrative forum, and to receive any payments to which they are entitled sunder the Workers' Compensation Program. Modification of the automatic stay as requested is consistent with the continuation of the Workers' Compensation Program and necessary for the covered employees to pursue their Workers' Compensation Claims. Accordingly, the Court should (a) modify the automatic stay as it relates to Workers' Compensation Claims to allow, in the Debtors' sole discretion, any such claims to proceed to resolution and (b) waive corresponding notice requirements under Bankruptcy Rule 4001. The Court should also authorize the Debtors, to the extent required by law or under the Workers' Compensation Program, to pay all or part of a claim related thereto directly to an employee, any of his or her medical providers, or any of his or her heirs or legal representatives, as set forth in the applicable law or policy.

Case 19-30089   Doc# 9   Filed: 01/29/19   Entered: 01/29/19 00:48:22   Page 19 of 22

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

### E. Applicable Banks Should Be Authorized to Receive, Process, Honor, and Pay Checks Issued and Transfers Requested on Account of the Insurance Obligations, Workers' Compensation Claims, and Surety Bond Obligations

The Debtors further request that the Court authorize, but not direct, the Banks to receive, process, honor, and pay, to the extent of funds on deposit, any and all checks issued or to be issued and electronic fund transfers requested or to be requested by the Debtors relating to the Insurance Obligations, the Workers' Compensation Claims, the Surety Bond Obligations and the Service Provider Fees. The Debtors also seek authority, but not direction, to issue new postpetition checks or effect new postpetition electronic fund transfers in replacement of any checks or transfer requests on account of any prepetition Insurance Obligations, Workers' Compensation Claims, Surety Bond Obligations or Service Provider Fees dishonored or rejected as a result of these Chapter 11 Cases.

## V. RESERVATION OF RIGHTS

Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## VI. IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003

Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. As described above, the Debtors are under a legal obligation to maintain many of their Insurance Policies, the Workers' Compensation Program, and their Surety Bonds. In addition, the termination, suspension, or nonrenewal of any of the Insurance Policies, the Workers' Compensation Program, or Surety Bonds as a result of nonpayment could subject the Debtors to substantial administrative liability as well as a potential cessation of operations, to the detriment of all parties in interest. Accordingly, the Debtors

have satisfied the requirements for immediate entry of an order granting the relief requested herein pursuant to Bankruptcy Rule 6003.

## VII.    REQUEST FOR BANKRUPTCY RULE 6004 WAIVER

The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors.  Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## VIII.   NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (ii) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Office of the California Attorney General; (vi) the California Public Utilities Commission; (vii) the Nuclear Regulatory Commission; (viii) the Federal Energy Regulatory Commission, (ix) the Office of the United States Attorney for the Northern District of California; (x) counsel for the agent under the Debtors' proposed debtor in possession financing facilities; (xi) the Banks; (xii) the Insurers listed on **Exhibit B** hereto; (xiii) the Sureties listed on **Exhibit C** hereto; and (xiv) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

Case: 19-30089    Doc# 9    Filed: 01/29/19    Entered: 01/29/19 00:48:22    Page 21 of 22

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 29, 2019

**WEIL, GOTSHAL & MANGES LLP**

**KELLER & BENVENUTTI LLP**

By:  /s/ Tobias S. Keller
          Tobias S. Keller

*Proposed Attorneys for Debtors*
*and Debtors in Possession*