WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice* pending)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice* pending)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice* pending)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors
and Debtors in Possession*

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>**PG&E CORPORATION,**<br><br>**Debtor.**<br><br>Tax I.D. No. 94-3234914 | Case Nos. 19 -\_\_\_\_\_ (\_\_\_)<br>          19 -\_\_\_\_\_ (\_\_\_)<br><br>Chapter 11<br><br>**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364 AND FED. R. BANKR. P. 6003 AND 6004 TO (A) HONOR PREPETITION OBLIGATIONS TO NATURAL GAS AND ELECTRICITY EXCHANGE OPERATORS, (B) GRANT ADMINISTRATIVE EXPENSE CLAIMS AND AUTHORIZE POSTING OF COLLATERAL TO EXCHANGE OPERATORS TRADING COUNTERPARTIES, AND FUTURE COMMISSION MERCHANTS, (C) MODIFY THE AUTOMATIC STAY, AND (D) GRANT RELATED RELIEF** |
| In re:<br><br>**PACIFIC GAS AND ELECTRIC COMPANY,**<br><br>**Debtor.**<br><br>Tax I.D. No. 94-0742640 | Date:<br>Time:<br>Place: |

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**"), as debtors and debtors in possession (collectively, "**PG&E**" or the "**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby submit this Motion (the "**Motion**"), pursuant to sections 105, 362, 363, and 364 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), for interim and final authority to (i) pay all outstanding Prepetition Exchange Obligations (as defined below) owed to ICE NGX Canada Inc. (together with certain of its affiliates and subsidiaries, "**ICE NGX**") and California Independent System Operator Corporation ("**CAISO**" and, together with ICE NGX, the "**Exchange Operators**"), under those certain Prepetition Exchange Agreements (as defined below), in the ordinary course as they come due, (ii) provide the Exchange Operators with administrative expense claims on account of all Exchange Obligations (as defined below), (iii) confirm the existing liens and security interests of the Exchange Operators in their collateral and authorize the Utility to pledge additional collateral to the Exchange Operators in the form of cash, letters of credit, and/or other forms of collateral acceptable to the parties on account of all Postpetition Exchange Obligations (as defined below), (iv) permit the Trading Counterparties (as defined below) to apply existing cash collateral to their prepetition obligations and authorize the Utility to provide cash collateral for postpetition obligations to Trading Counterparties, (v) provide cash or other collateral to the Future Commission Merchants (as defined below), and (vi) modify the automatic stay under section 362 of the Bankruptcy Code to the extent necessary to allow the (A) Exchange Operators to exercise any valid rights of setoff or recoupment (the **"Trade Setoff"**), and to apply collateral and the proceeds thereof and settle transactions, whether undertaken with respect to collateral or obligations that arose, and whether such collateral and proceeds were posted or arose, prior to or after the Petition Date (as defined below), and, upon default, exercise their rights, in each case under and in accordance with the terms of the agreements and tariffs that govern the relationship between the Exchange Operators and the Utility, and (B) Trading Counterparties to exercise any valid right to setoff, settle or recoup any mutual obligations owing by the Utility to such Trading Counterparties, and to apply cash collateral to prepetition obligations, notwithstanding any limits otherwise imposed by section 553 of the Bankruptcy Code, and (vii) grant related relief.

A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit A** (the "**Proposed Interim Order**").

Case 19-10088    Doc 53    Filed 01/29/19    Entered: 01/29/19 01:14:17    Page 3 of 22

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

# **TABLE OF CONTENTS**

**Page**

I.    JURISDICTION ............................................................................................................. 8

II.   BACKGROUND ........................................................................................................... 8

III.  THE DEBTORS' PREPETITION EXCHANGE AGREEMENTS ............................... 8

IV.   BASIS FOR RELIEF REQUESTED .......................................................................... 14

      A.    Authorizing Payment of the Prepetition Exchange Obligations Is a Sound Exercise of the Debtors' Business Judgment.......................................................... 15

      B.    The Utility Should Be Authorized to Provide the Administrative Expense Claims and Pledge Additional Exchange Collateral Pursuant to Section 364 of the Bankruptcy Code. ............................................................................................ 18

      C.    The Exchange Operators and Trading Counterparties Should Be Permitted to Setoff or Recoup Exchange Obligations and Apply Exchange Collateral ..................................... 19

      D.    The Automatic Stay Should Be Modified on a Limited Basis ........................... 19

V.    RESERVATION OF RIGHTS ................................................................................... 20

VI.   IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003 ....... 20

VII.  REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS .......................................... 21

VIII. NOTICE ...................................................................................................................... 21

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case 19-10118 Doc 125 Filed 01/29/19    Entered: 01/29/19 01:14:17    Page 4 of 22

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Adams Apple, Inc.*,
   829 F.2d 1484 (9th Cir. 1987) .................................................................................17

*In Matter of B & W Enterprises, Inc.*,
   713 F.2d 534 (9th Cir. 1983) ...........................................................................16, 17

*In re Calpine Corp.*,
   No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005) .................................18

*In re Chateaugay Corp.*,
   80 B.R. 279 (S.D.N.Y. 1987)............................................................................16

*In re Curlew Valley Assocs.*,
   14 B.R. 506 (Bankr. D. Utah 1981) .................................................................18

*Czyzewski v. Jevic Holding Corp.*,
   137 S. Ct. 973 (2017)........................................................................................15

*In re Eagle–Picher Indus., Inc.*,
   124 B.R. 1021 (Bankr. S.D. Ohio 1991)..........................................................16

*In re Energy Future Holdings Corp.*,
   No. 14-10979 (CSS) (Bankr. D. Del. June 30, 2014) ......................................19

*In re Financial News Network, Inc.*
   134 B.R. 732 (Bankr. S.D.N.Y. 1991) ............................................................16

*In re GenOn Energy, Inc.*,
   Case No. 17-33695 (Bankr. S. D. Tex. July 14, 2017) ....................................18

*Gordon v. Hines (In re Hines)*,
   147 F.3d 1185 (9th Cir. 1998) .........................................................................17

*In re Gulf Air*,
   112 B.R. 152 (Bankr. W.D. La. 1989) .............................................................16

*In re Just For Feet, Inc.*,
   242 B.R. 821 (D. Del. 1999).............................................................................16

*In re L.A. Dodgers LLC*,
   457 B.R. 308 (Bankr. D. Del. 2011) ................................................................18

*In re Linn Energy, LLC*,
   No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 17, 2016) ..................................18

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30088    Doc# 15    Filed: 01/29/19    Entered: 01/29/19 01:14:17    Page 5 of 22

*Miltenberger v. Logansport, C&S W.R. Co.*,
    106 U.S. 286 (1882) .................................................................................16

*In re NVR L.P.*,
    147 B.R. 126 (Bankr. E.D. Va. 1992) .....................................................16

*In re Penn Va. Corp.*,
    No. 16-32395 (KLP) (Bankr. E.D. Va. May 13, 2016) ..........................18

*In re Pettit Oil Co.*,
    No. 13-47285, 2015 WL 6684225 (Bankr. W.D. Wash. Oct. 22, 2015) ......................17

*In re Structurlite Plastics Corp.*,
    86 B.R. 922 (Bankr. S.D. Ohio 1988) ....................................................16

**Statutes**

11 U.S.C. § 105 .........................................................................................2, 16

11 U.S.C. § 362 .........................................................................................2, 19

11 U.S.C. § 362(b) .........................................................................................14

11 U.S.C. § 363 ................................................................................................2

11 U.S.C. § 364 .........................................................................................2, 18

11 U.S.C. § 364(b) .........................................................................................12

11 U.S.C. § 364(c) .........................................................................................18

11 U.S.C. § 364(d) .........................................................................................18

11 U.S.C. § 365 ...............................................................................................20

11 U.S.C. § 365(e) .........................................................................................14

11 U.S.C. § 553 ...............................................................................2, 15, 19, 20

11 U.S.C. § 1107(a) ..........................................................................................8

11 U.S.C. § 1108 ...............................................................................................8

28 U.S.C. §§ 157 ...............................................................................................8

28 U.S.C. § 157(b) ............................................................................................8

28 U.S.C. § 1334 ...............................................................................................8

28 U.S.C. § 1408 ...............................................................................................8

28 U.S.C. § 1409 ...............................................................................................8

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Other Authorities**

B.L.R. § 5011-1(a) ............................................................................................................8

Fed. R. Bankr. P. 2002 .....................................................................................................21

Fed. R. Bankr. P. 6003 ...............................................................................................20, 21

Fed. R. Bankr. P. 6004 .....................................................................................................21

Fed. R. Bankr. P. 6004(a) .................................................................................................21

Fed. R. Bankr. P. 6004(h) .................................................................................................21

*Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges,*

    General Order 24 (N.D. Cal.) ....................................................................................8

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. JURISDICTION

The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, the *Order Referring Bankruptcy Cases and Proceedings to Bankruptcy Judges*, General Order 24 (N.D. Cal.), and Rule 5011-1(a) of the Bankruptcy Local Rules for the United States District Court for the Northern District of California (the "**Bankruptcy Local Rules**"). This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II. BACKGROUND

On the date hereof (the "**Petition Date**"), the Debtors commenced with the Court voluntary cases under chapter 11 of the Bankruptcy Code. The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee has been appointed in either of the Chapter 11 Cases.

Additional information regarding the circumstances leading to the commencement of the Chapter 11 Cases and information regarding the Debtors' businesses and capital structure is set forth in the Declaration of Jason P. Wells, Senior Vice President and Chief Financial Officer of PG&E Corp., filed contemporaneously herewith in support of the Debtors' chapter 11 petitions and related first day relief (the "**Wells Declaration**").

## III. THE DEBTORS' PREPETITION EXCHANGE AGREEMENTS

### *ICE NGX*

To clear transactions relating to the procurement of natural gas, the Utility is party to that certain contracting party agreement (the "**CPA**") with ICE NGX. ICE NGX is a centralized exchange and clearinghouse (the "**NGX Exchange**" and the Utility's obligations thereunder, the "**NGX Exchange Obligations**") that provides electronic trading, central counterparty clearing, and data services to natural gas, crude oil, and electricity markets in North America. Pursuant to the CPA, the Utility purchases natural gas from ICE NGX for (i) its core gas supply, which is delivered to "core" customers (e.g., residential and small commercial customers), (ii) its electric gas supply, which is used to fuel the Utility's gas-fired electric generation facilities, including certain units operating under tolling agreements, and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

(iii) for temporary storage in both Utility-owned and third party-owned gas storage facilities. The Utility also sells excess natural gas through the NGX Exchange.

The Utility participates on the NGX Exchange primarily through the purchase of futures contracts for natural gas. The Utility typically orders natural gas supply through ICE NGX for a particular month – the month's "flow" – in the prior month, but the Utility may also enter into daily orders for the next day's "flow." For example, in January 2019, the Utility placed orders through ICE NGX on the NGX Exchange to cover its February 2019 "flow." Payment to ICE NGX is generally not due until the 25th day of the month following the month in which the natural gas is delivered to the Utility.

Given the delay between the placement of orders for natural gas, deliveries of natural gas, and the payment thereon, ICE NGX requires the Utility to post collateral and other credit support to secure payment for transactions effected through the NGX Exchange (such collateral, and all proceeds thereof, the "**NGX Collateral**"), and, in some instances, to prepay such obligations. ICE NGX is the only party with any lien or security interest on the NGX Collateral, and ICE NGX holds a first-priority lien on, and security interest in, all NGX Collateral.

Pursuant to the CPA, NGX Exchange Obligations are required to be fully-collateralized on a daily basis and the value of collateral may change on a day-to-day basis due to fluctuations in natural gas prices. The Utility's failure to post appropriate NGX Collateral can result in ICE NGX, among other things, having the right or ability under the CPA to (i) declare all NGX Exchange Obligations immediately due and payable, (ii) request additional NGX Collateral, (iii) terminate any open transactions, and/or (iv) suspend the Utility's participation in the NGX Exchange. In addition, under the CPA, ICE NGX is authorized to setoff, settle, or otherwise recoup amounts owed by the Utility to ICE NGX against amounts owed by ICE NGX to the Utility.

The Utility purchases a significant amount of its natural gas each month through the NGX Exchange, including approximately $40 million for January 2019 deliveries, representing approximately 92% of the supply needed for its electric gas supply, and approximately 19% for its core gas supply customers. Given the Utility's current credit rating, its ability to procure natural gas from alternative suppliers is extremely limited. Should the Utility be unable to procure gas through the NGX Exchange, it may be foreclosed from participating in natural gas markets altogether. As a result, the Utility would

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

be required to deplete its limited reserves of natural gas in an effort to delay a natural gas shortfall. Depending on weather conditions and the appetite for other natural gas suppliers to honor existing contracts, gas in storage could be exhausted in a matter of weeks, forcing the Utility to stop delivering natural gas to some customers.

Moreover, even if the Utility were able to secure alternative suppliers that may be willing to supply natural gas to the Utility, such alternative suppliers would likely charge higher prices, which may be passed on to the Utility's customers through higher bills. These alternative suppliers may also impose extremely burdensome contract terms on the Utility. Accordingly, preserving the Utility's ability to participate in the NGX Exchange is essential to accessing sufficient natural gas supplies needed to maintain uninterrupted utility services and the success of these Chapter 11 Cases.

### *CAISO*

Due to the complexities involved in storing electricity after it is generated and transmitting it to end users, the Utility participates in energy markets operated by the CAISO (the "**CAISO Market**" and, together with the NGX Exchange, the "**Exchanges**"). CAISO settles transactions by the Utility and its other participants, including transactions in the CAISO Market, and issues charges for services related to maintaining the reliability of the grid, pursuant to the rates, terms and conditions of a tariff approved by the Federal Energy Regulatory Commission (the "**Tariff**" and, together with ICE NGX's CPA, the "**Prepetition Exchange Agreements**"). CAISO controls a competitive wholesale electricity market in California and manages access to, and the reliability of, the bulk of the transmission system in California. CAISO provides the Utility with particular channels to buy and sell electricity, which is critical to the Utility's operations, and to transmit the electricity it generates, buys and sells. The Utility also utilizes CAISO to obtain transmission congestion instruments to mitigate the Utility's risks associated with electricity generation assets. The Utility procures all of the energy needed to meet its customers' demand through the CAISO Market. The Utility sells and transmits all of the power it generates and purchases under power purchase agreements to CAISO. CAISO determines which of the Utility's resources (or those controlled by other parties) to operate at which times to meet the CAISO system wide load and ensure the reliability of the grid.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Given CAISO's central role in California's electricity market, the Utility consummates transactions through CAISO that it would not otherwise be able to execute with any other party or entity. Specifically, through CAISO and the CAISO Market, the Utility: (i) sells all of the energy from its Utility owned generation units as well as those units it has under contract with third parties, (ii) purchases all of the energy in the day-ahead and real-time energy markets to meet customer demands, (iii) acts as a scheduling coordinator for the Utility's generation facilities as well as certain third-party generation facilities, (iv) transmits the power it generates, buys, and sells, (v) sells and purchases congestion revenue rights, and (vi) settles for other services as required as a load serving entity. Because the Utility buys and sells all of the electricity through CAISO that it needs to meet customer demand and to generate revenue from its generation portfolio, any disruption or the loss of access to this market would severely impact the Utility's ability to operate. In that scenario, the Utility would be unable to generate revenue from its owned and contracted resources and, likewise, would be unable to buy electricity to meet the demands of its customers.

Although the Utility is often a "net" creditor of CAISO, because it has been a net seller of energy to the CAISO Market, it may also at any given time owe money to CAISO on a net basis. To minimize credit risk, the Utility's liabilities to CAISO for the charges described in the Tariff (collectively, the "**CAISO Obligations**" and, together with the NGX Obligations, the "**Exchange Obligations**") are secured by collateral, such as cash collateral and/or letters of credit, the amount and form of which are controlled by the terms of the Tariff (the "**CAISO Collateral**" and, together with the NGX Collateral, the "**Exchange Collateral**"). In addition, CAISO is authorized under the Tariff to setoff, settle, or otherwise recoup amounts owed by the Utility to CAISO against amounts owed by CAISO to the Utility. To the extent amounts owed by the Utility to CAISO exceed amounts owed by CAISO, the Utility must pay the difference in cash. The Utility's failure to meet its obligations to CAISO can result in CAISO's refusal to continue to do business with the Utility, and/or refusal to allow the Utility to participate in the CAISO Market. The Utility may also be precluded from acting as a scheduling coordinator for generation facilities.

The Utility's participation on the Exchanges is currently governed by the Utility's market risk and credit policies, which establish internal policies and controls with respect to Exchange activity.

As of the Petition Date, the Utility estimates that it owes approximately $38 million to ICE NGX and approximately $13.7 million to CAISO on account of prepetition Exchange Obligations (collectively, the "**Prepetition Exchange Obligations**"). CAISO invoices its participants, including the Utility, each Wednesday (and at other times depending on the charge type) and payment is due on the fourth business day after the invoice is issued. ICE NGX's Prepetition Exchange Obligations will become due and owing during the thirty (30) days after the Petition Date. As of the Petition Date, ICE NGX and CAISO are holding cash collateral in the amounts of $36.4 million and $40 million, respectively.

Participating in the Exchanges protects the Utility from harmful fluctuations in commodity prices and helps it to better manage the future energy demands of its customers. Specifically, participation in the Exchanges enables the Utility to procure natural gas for the long-term, thereby fixing the Utility's exposure to pricing. The Utility can also make short-term purchases of gas and power through the Exchanges, which enables the Utility to cover customer shortfalls quickly and efficiently, or quickly sell excess supply, thereby mitigating the Utility's losses associated therewith.

To maintain continued access to the critical gas and power markets in which the Utility operates, and to maintain the Utility's access to the power grid over which it must transmit nearly all of the power it buys, sells, and generates, the Utility requests authority for the Exchange Operators to setoff, settle, or recoup Prepetition Exchange Obligations and apply Exchange Collateral in satisfaction thereof to the extent permitted by the terms of the Prepetition Exchange Agreements, and for the Utility to pay the Prepetition Exchange Obligations in the ordinary course of business on a postpetition basis including "true-up" amounts which may be invoiced in the future for prepetition delivery dates or charges. (True-ups may result, for example, from revisions to estimated versus actual volumes and service charges and may lag behind the initial invoice by months or more). In addition, the Utility is seeking authority to ensure payment of ongoing Prepetition Exchange Obligations and postpetition obligations to the Exchange Operators under the Prepetition Exchange Agreements (collectively, the "**Postpetition Exchange Obligations**," which, together with the Prepetition Exchange Obligations, constitute Exchange Obligations) by: (i) providing the Exchange Operators with administrative expense claims on account of the Exchange Obligations under section 364(b) of the Bankruptcy Code (the "**Administrative**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

**Expense Claims**"), and (ii) confirming the first-priority liens and security interests of the Exchange Operators in the existing Exchange Collateral and seeking authority to pledge additional collateral to the Exchange Operators, as applicable, in the ordinary course of business and consistent with the Prepetition Exchange Agreements to secure postpetition obligations, including the Postpetition Exchange Obligations, on a first-priority basis in such collateral (the "**Postpetition Exchange Collateral**"). Because the Prepetition Exchange Obligations are fully secured, no other parties in interest will be prejudiced by the foregoing relief.

Additionally, the Utility participates in other gas and electricity markets and exchanges, and is concerned that certain counterparties in those markets and exchanges, such as natural gas suppliers, natural gas transportation providers, natural gas storage providers, gas fired electric generators, renewable electric generators, RPS shaping and firming providers, and buyers of the Utility's resource adequacy and renewable energy products (collectively, the "**Trading Counterparties**") may seek to terminate their agreements with the Utility or seek to liquidate the Utility's natural gas or electricity positions as a result of the commencement of these Chapter 11 Cases. The Trading Counterparties currently hold cash collateral as security for outstanding obligations. In order to avoid a termination of their agreements, pursuant to this Motion, the Utility also requests that the Trading Counterparties be authorized to exercise any valid setoff rights, apply cash collateral to outstanding obligations, and, to the extent of any excess cash collateral, continue to hold the same to secure postpetition obligations to the Trading Counterparties. The Utility also requests authority to provide the Trading Counterparties with cash or other collateral in connection with ongoing postpetition transactions.

### *FCM*

In addition to the Exchange Operators, the Utility is party to certain agreements (the "**Prepetition FCM Agreements**") with Macquarie Futures USA LLC and BNP Paribas Securities Corp. (collectively, the "**Future Commission Merchants**") to buy or sell futures contracts (or options on futures contracts) and other forward contracts related to certain commodities and commodity related products. The Future Commission Merchants solicit or accept orders to buy or sell futures contracts, options on futures, retail off-exchange forex contracts or swaps, and accept money or other assets from customers to support such orders. In connection with the Prepetition FCM Agreements, the Utility is required to provide collateral,

including initial margin and variation margin, from time to time in such amounts, at such times, and in such form (usually cash) as requested by each Future Commission Merchant in its discretion. The collateral amounts requested by a Future Commission Merchant may be affected by the Utility's open trading positions and the Future Commission Merchant's perception of the Utility's credit risk. Again, in order to avoid a termination of the Prepetition FCM Agreements, which provide the Utility with the ability to protect against price fluctuations, the Utility seeks authority to provide such additional cash or other collateral required by the Prepetition FCM Agreements in an amount not to exceed $15,000,000.

## IV. BASIS FOR RELIEF REQUESTED

Certain trading contracts are granted unique rights under the Bankruptcy Code. Specifically, sections 546(e)–(g) (providing relief from certain avoidance actions), section 555 (providing for the liquidation of certain security accounts), section 556 (providing for the liquidation of forward and commodity contracts), section 559 (providing for the liquidation of certain repurchase agreements), and section 560 (providing for the liquidation of certain swap agreements) of the Bankruptcy Code, in combination with sections 362(b)(6), (7) and (17) of the Bankruptcy Code—often referred to as the "safe harbors"—contain special protections granted to counterparties to future, forward, and financial contracts that enable financial contract counterparties to:

(a) terminate, liquidate, and/or accelerate a commodities contract, forward contract, or swap agreement upon the bankruptcy filing of the other party, notwithstanding the anti-ipso-facto protections of section 365(e)(1) of the Bankruptcy Code;

(b) protect prepetition payments made under a commodity or forward contract or repurchase or swap agreement by the debtor to the non-debtor party from the avoidance powers of a trustee or debtor in possession, except in particular cases of actual intent to defraud other creditors; and

(c) to setoff mutual debts and claims against the debtor under a commodity or forward contract or repurchase or swap agreement without the need to obtain relief from the automatic stay, *provided that* the underlying agreement allows for such setoff.

Given the above-described unique rights available for certain trading contracts under the Bankruptcy Code, the Utility believes that the Exchange Operators and/or Trading Counterparties may prematurely seek to terminate contracts or agreements or take other adverse actions. Accordingly, in view of these circumstances and the critical nature of the Exchange Operators and Trading Counterparties to the Utility's ongoing operations, the Utility seeks authority to continue normal and

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

1  uninterrupted business operations with the Exchange Operators and Trading Counterparties and requests

2  authority to, among other things, (i) pay all Prepetition Exchange Obligations, (ii) provide the Exchange

3  Operators with Administrative Expense Claims and post additional Postpetition Exchange Collateral on

4  account of all Postpetition Exchange Obligations, and (iii) modify the automatic stay to the extent

5  necessary to allow (A) the Exchange Operators to exercise any Trade Setoff, apply Exchange Collateral

6  and settle transactions, in each case in accordance with the terms of the Prepetition Exchange

7  Agreements, whether undertaken with respect to collateral or obligations that arose prior to, or after, the

8  Petition Date, and (B) the Trading Counterparties to apply cash collateral and exercise any valid right

9  to setoff, settle, or recoup any mutual obligations owing by the Utility to such Trading Counterparties,

10  whether such obligations relate to the periods prior to, or after, the Petition Date, notwithstanding any

11  limits otherwise imposed by section 553 of the Bankruptcy Code.

12  **A.**   **Authorizing Payment of the Prepetition Exchange Obligations Is a Sound Exercise**
13  **of the Debtors' Business Judgment.**

14  Allowing the Utility to continue its trading and exchange practices in the ordinary course, without

15  interruption, including the payment of any Prepetition Exchange Obligations, and the furnishing of

16  collateral in connection therewith, is a sound exercise of its business judgment. The Utility has utilized

17  the same, or substantially similar, exchange practices for years. Indeed, it is impossible for the Utility

18  to operate its business without such practices. In particular, absent the ability to participate in the

19  Exchanges, the Utility would simply be unable to effectively procure and sell its natural gas and

20  electricity—a result that may lead to the Utility's inability to meet customer demand, risks to gas and

21  electric system reliability in California and, with respect to the CAISO practices, to pricing volatility in

22  the power markets or to a decrease in the reliability of the state-wide system.

23  Numerous Courts have acknowledged that payment of prepetition obligations, irrespective of

24  statutory priorities, may be necessary to realize the objectives of the Bankruptcy Code, such as the

25  preservation and enhancement of the value of a debtor's estate for the benefit of all creditors and other

26  stakeholders. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts

27  have approved distributions that are not consistent with ordinary priority rules in instances where

28  significant Code-related objectives, such as enabling a successful reorganization, would be served and

Case: 19-30089   Doc# 15   Filed: 01/29/19   Entered: 01/29/19 01:14:17   Page 15 of
22

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

listing examples such as "first-day wage orders that allow payment of employees' prepetition wages, critical vendor orders that allow payment of essential suppliers' prepetition invoices, and roll-ups that allow lenders who continue financing the debtor to be paid first on their prepetition claims"); *Miltenberger v. Logansport, C&S W.R. Co.*, 106 U.S. 286, 312 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of the continuance of [crucial] business relations"); *In re Just For Feet, Inc.*, 242 B.R. 821, 826 (D. Del. 1999) (allowing payment of prepetition claim because debtor could not survive without maintaining customer relationship); *In re Financial News Network, Inc.* 134 B.R. 732, 736 (Bankr. S.D.N.Y. 1991) (payment of prepetition claims allowed if "critical to the debtor's reorganization"); *In re NVR L.P.*, 147 B.R. 126, 128 (Bankr. E.D. Va. 1992) (holding that "proponent of the payment must show substantial necessity"); *In re Eagle–Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (stating that payment must be "necessary to avert a serious threat to the chapter 11 process").

Although there is a Ninth Circuit decision which fails to recognize the grant of authority given by the Bankruptcy Code to elevate certain prepetition payments over others, that case is easily distinguishable from these Chapter 11 Cases and the relief sought herein, as the prepetition payments at issue there were made by the debtor without notice, hearing, or authorization from the Bankruptcy Court. *In Matter of B & W Enterprises, Inc.*, 713 F.2d 534, 535 (9th Cir. 1983). Furthermore, although the *B & W* court noted that the "necessity of payment" doctrine was established in railroad reorganization cases, *id.* at 535, numerous courts have extended the doctrine beyond the railroad reorganization context. *See, e.g., In re Structurlite Plastics Corp.*, 86 B.R. 922, 931 (Bankr. S.D. Ohio 1988) ("a bankruptcy court may exercise its equity powers under § 105(a) [of the Bankruptcy Code] to authorize payment of prepetition claims where such payment is necessary to permit the greatest likelihood of survival of the debtors and payment of creditors in full or at least proportionately"); *In re Gulf Air*, 112 B.R. 152, 153 (Bankr. W.D. La. 1989) (finding that payment of prepetition wage and benefit obligations was in the best interest of creditors and necessary for the successful reorganization of the debtor and granting the debtor's motion to pay prepetition employee expenses); *In re Chateaugay Corp.*, 80 B.R. 279, 285 (S.D.N.Y. 1987) (finding that bankruptcy courts have the authority to authorize the debtor to pay certain prepetition claims).

Moreover, since *B & W*, the Ninth Circuit has noted in other instances that certain prepetition payments should be authorized regardless of whether they are priority payments under the Bankruptcy Code.  *See In re Adams Apple, Inc.*, 829 F.2d 1484, 1490 (9th Cir. 1987).  In that case, in rejecting the appellants' argument that the cross-collateralization clause in a financing agreement violated the "fundamental tenet of bankruptcy law that like creditors must be treated alike," the Court of Appeals noted that the argument was "flawed because the fundamental tenet conflicts with another fundamental tenet – rehabilitation of debtors, which may supersede the policy of equal treatment."  *Id.*  The Ninth Circuit further stated that:

> [c]ases have permitted unequal treatment of pre-petition debts when necessary for rehabilitation, in such contexts as (i) pre-petition wages to key employees; (ii) hospital malpractice premiums incurred prior to filing; (iii) debts to providers of unique and irreplaceable supplies; and (iv) peripheral benefits under labor contracts.

*Id.*

Numerous courts within the Ninth Circuit have followed the reasoning of *In re Adams Apple* in holding that the payment of certain prepetition claims is not categorically barred when the payments promote the rehabilitation of the debtor. *See, e.g., In re Pettit Oil Co.*, No. 13-47285, 2015 WL 6684225, at *8 (Bankr. W.D. Wash. Oct. 22, 2015) (citing *In re Adams Apple Inc.* for proposition that it "is permissible to treat prepetition debts unequally when necessary for rehabilitation."); *Gordon v. Hines (In re Hines)*, 147 F.3d 1185, 1191 (9th Cir. 1998) (applying "essentially a doctrine of necessity" to provide for the payment of the fees of debtor's counsel in chapter 7 cases because without this right the "entire [chapter 7] system would suffer a massive breakdown").

Payment of the Prepetition Exchange Obligations is essential to the Utility's continued operations and the proper functioning of the California gas and power markets within which the Utility plays a crucial role.  Any limitation on the Utility's ability to continue their prepetition trading and exchange practices will: (i) cause disruption to the Utility's operations and, potentially, to the California gas and power markets; and (ii) compromise the Utility's ability to procure natural gas and power in amounts needed to satisfy customer demand and maintain system reliability.  The Exchange Operators are currently in possession of significant amounts of collateral and are fully secured with respect to the Prepetition Exchange Obligations.  Consequently, as stated, the relief requested herein will not prejudice

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

any party in interest, including the Utility's unsecured creditors. Accordingly, the Utility respectfully submits that payment of the Prepetition Exchange Obligations is in the best interests of the Utility and all parties in interest.

### B. The Utility Should Be Authorized to Provide the Administrative Expense Claims and Pledge Additional Exchange Collateral Pursuant to Section 364 of the Bankruptcy Code.

Section 364 of the Bankruptcy Code authorizes a debtor to obtain "credit" on a superpriority or senior secured basis when obtaining such credit on other terms is unavailable. 11 U.S.C. §§ 364(c), (d). Courts generally afford debtors considerable deference to determine, in their business judgment, the terms under which they obtain postpetition secured credit. *See, e.g., In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981).[1]

To provide the necessary comfort to the Exchange Operators that the Utility will be able to honor commitments under the Prepetition Exchange Agreements, the Utility seeks authority to provide the Administrative Expense Claims, confirm the liens and security interests in the existing Exchange Collateral on a first-priority basis, and pledge the Postpetition Exchange Collateral on account of the Exchange Obligations on a first-priority basis. Courts in other jurisdictions have approved similar relief. *See, e.g., In re GenOn Energy, Inc.*, Case No. 17-33695 (Bankr. S. D. Tex. July 14, 2017) (ECF No. 66); *In re Linn Energy, LLC*, No. 16-60040 (DRJ) (Bankr. S.D. Tex. May 17, 2016) (ECF No. 128); *In re Penn Va. Corp.*, No. 16-32395 (KLP) (Bankr. E.D. Va. May 13, 2016) (ECF No. 65); *In re Energy Future Holdings Corp.*, No. 14-10979 (CSS) (Bankr. D. Del. June 30, 2014) (ECF No. 315); *In re Calpine Corp.*, No. 05-60200 (BRL) (Bankr. S.D.N.Y. Dec. 21, 2005) (ECF No. 28).

---

[1] The Exchange Operators have the only, and a first-priority, lien and security interest on all their respective existing Exchange Collateral, and any additional Postpetition Exchange Collateral would be provided to the Exchange Operators on the same basis. Accordingly, the confirmation of the Exchange Operators' existing liens and security interests, and the grant of additional liens and security interests, as requested, hereunder is appropriate under section 364(c)(2) of the Bankruptcy Code; provided that, to the extent that any other lien or security interest may now or hereafter exist as to any Exchange Collateral, the Debtors also seek to provide the Exchange Operators "priming" liens on their own Exchange Collateral under section 364(d) of the Bankruptcy Code. Such treatment is appropriate because, given the nature of their relationships with the Debtors, the Exchange Operators are the only parties able to provide credit to the Debtors in respect of the transactions between the Exchange Operators and the Debtors, and because no other party has any interest in Exchange Collateral that would require adequate protection.

As discussed above, allowing for the continuation of the Utility's prepetition trading and exchange practices is essential both to the stability of the Utility's businesses and to its ability to provide reliable service to customers. Providing the Administrative Expense Claims and pledging the Postpetition Exchange Collateral are not unduly burdensome on the Utility and do not prejudice any other parties in interest, and the Utility believes these grants are necessary to continue its trading and exchange practices. The Utility has more than ample liquidity, with cash on hand and a commitment for approximately $5.5 billion in debtor-in-possession financing, to post the requisite Postpetition Exchange Collateral and provide the Administrative Expense Claims. Moreover, the Debtors' proposed debtor-in-possession financing permits the pledging of Postpetition Exchange Collateral. In light of the foregoing, the Utility believes that authorizing it to provide the Administrative Expense Claims, confirm the liens and security interests on the existing Exchange Collateral, and pledge the Postpetition Exchange Collateral is appropriate and should be authorized and approved.

**C.      The Exchange Operators and Trading Counterparties Should Be Permitted to Setoff or Recoup Exchange Obligations and Apply Exchange Collateral.**

There is substantial authority under the Bankruptcy Code to permit the Exchange Operators and the Trading Counterparties to setoff, settle, or recoup mutual debts with the Debtors, and to apply Exchange Collateral or other collateral, as applicable, with respect to such debts, whether such debts have arisen, or will arise, prior to, or after, the Petition Date. For instance, with respect to the setoff of mutual debts, such relief is authorized by section 553 of the Bankruptcy Code. *See* 11 U.S.C. § 553. Moreover, as discussed above, courts have recognized that it is appropriate to authorize the payment of prepetition obligations where necessary to protect and preserve the estate, including an operating business's going-concern value. Accordingly, it is well within the Court's authority to permit the Exchanges and Trading Counterparties to setoff, settle, or recoup mutual debts with the Utility and to apply Exchange Collateral and other collateral with respect to such debts, whether such debts have arisen, or will arise, prior to, or after, the Petition Date.

**D.      The Automatic Stay Should Be Modified on a Limited Basis.**

The Proposed Interim Order modifies the automatic stay provisions of section 362 of the Bankruptcy Code solely to the extent necessary to allow (i) the Exchange Operators to (a) exercise any

Case: 19-30089    Doc# 15    Filed: 01/29/19    Entered: 01/29/19 01:14:17    Page 19 of
22

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153-0119

Trade Setoff, apply Exchange Collateral and settle transactions, in each case in accordance with the terms of the Prepetition Exchange Agreements, whether undertaken with respect to obligations that arose prior to, or after, the Petition Date, (b) take all actions to validate and perfect the liens and security interests granted by the Utility in the Exchange Collateral, and (c) exercise their rights under and in accordance with the terms of the Prepetition Exchange Agreements upon default by the Utility, and (ii) the Trading Counterparties to exercise any valid right to setoff or settle any mutual obligations owing by the Utility to such Trading Counterparties, whether such obligations relate to the periods prior to, or after, the Petition Date, notwithstanding any limits otherwise imposed by section 553 of the Bankruptcy Code.

The stay modification, in the Utility's business judgment, is reasonable and fair under the circumstances of the Chapter 11 Cases. Accordingly, the Court should modify the automatic stay to the extent contemplated by the Proposed Interim Order.

## V. RESERVATION OF RIGHTS

Nothing contained herein is intended to be or shall be construed as (i) an admission as to the validity of any claim against the Debtors, (ii) a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim, or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## VI. IMMEDIATE ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 6003

Bankruptcy Rule 6003 provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a Bankruptcy Court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. The relief requested herein is necessary to avoid immediate and irreparable harm because any limitation on the Debtors' ability to participate in the Exchanges and the other transactions described herein will: (i) cause disruption to the Debtors' operations and, potentially, to the California power markets; and (iii)

Case: 19-30089   Doc# 15   Filed: 01/29/19   Entered: 01/29/19 01:14:17   Page 20 of
22

compromise the Debtors' ability to procure natural gas and power in amounts needed to satisfy customer demand.

Accordingly, the Debtors have satisfied the requirements for immediate entry of an order granting the relief requested herein pursuant to Bankruptcy Rule 6003.

## VII.    REQUEST FOR BANKRUPTCY RULE 6004 WAIVERS

The Debtors request a waiver of the notice requirements under Bankruptcy Rule 6004(a) and any stay of the order granting the relief requested herein pursuant to Bankruptcy Rule 6004(h).  As explained above, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors. Accordingly, ample cause exists to justify the waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and stay apply.

## VIII.   NOTICE

Notice of this Motion will be provided to (i) the Office of the United States Trustee for Region 17 (Attn: James L. Snyder, Esq. and Timothy Laffredi, Esq.); (ii) the Debtors' fifty (50) largest unsecured creditors on a consolidated basis; (iii) the Securities and Exchange Commission; (iv) the Internal Revenue Service; (v) the Office of the California Attorney General; (vi) the California Public Utilities Commission; (vii)  the Nuclear Regulatory Commission; (viii) the Federal Energy Regulatory Commission; (ix) the Office of the United States Attorney for the Northern District of California; (x) counsel for the agent under the Debtors' proposed debtor in possession financing facilities; (xi) the Exchange Operators; (xii) the Future Commission Merchants; (xiii) the Banks; and (xiv) those persons who have formally appeared in these Chapter 11 Cases and requested service pursuant to Bankruptcy Rule 2002.  Based on the urgency of the circumstances surrounding this Motion and the nature of the relief requested herein, the Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other court.

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY  10153-0119

Case: 19-30089    Doc# 15    Filed: 01/29/19    Entered: 01/29/19 01:14:17    Page 21 of
22

WHEREFORE the Debtors respectfully request entry of an order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: January 29, 2019

**WEIL, GOTSHAL, & MANGES LLP**

**KELLER & BENVENUTTI LLP**

/s/ Tobias S. Keller
    Tobias S. Keller

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**Weil, Gotshal & Manges LLP**
767 Fifth Avenue
New York, NY 10153-0119

Case: 19-30089    Doc# 15    Filed: 01/29/19    Entered: 01/29/19 01:14:17    Page 22 of
22