WEIL, GOTSHAL & MANGES LLP
Stephen Karotkin (*pro hac vice* pending)
(stephen.karotkin@weil.com)
Jessica Liou (*pro hac vice* pending)
(jessica.liou@weil.com)
Matthew Goren (*pro hac vice* pending)
(matthew.goren@weil.com)
767 Fifth Avenue
New York, NY 10153-0119
Tel: 212 310 8000
Fax: 212 310 8007

CRAVATH, SWAINE & MOORE LLP
Paul H. Zumbro (*pro hac vice* pending)
(pzumbro@cravath.com)
Kevin J. Orsini (*pro hac vice* pending)
(korsini@cravath.com)
Omid H. Nasab (*pro hac vice* pending)
(onasab@cravath.com)
825 Eighth Avenue
New York, NY 10019
Tel: 212 474 1000
Fax: 212 474 3700

KELLER & BENVENUTTI LLP
Tobias S. Keller (#151445)
(tkeller@kellerbenvenutti.com)
Jane Kim (#298192)
(jkim@kellerbenvenutti.com)
650 California Street, Suite 1900
San Francisco, CA 94108
Tel: 415 496 6723
Fax: 650 636 9251

*Proposed Attorneys for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| **In re:**<br><br>**PG&E CORPORATION**<br><br>           Debtor.<br><br>Tax I.D. No. 94-3234914 | Case Nos. 19-30088<br>                 19-30089<br><br>Chapter 11<br><br>**DECLARATION OF DAVID KURTZ IN SUPPORT OF DEBTORS' MOTION PURSUANT TO 11 U.S.C. §§ 105, 362, 363, 364, 503 AND 507 AND FED. R. BANKR. P. 2002, 4001, 6003, 6004 AND 9014 FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR SECURED, SUPERPRIORITY, POSTPETITION FINANCING, (II) GRANTING LIENS AND** |
| **In re:**<br><br>**PACIFIC GAS AND ELECTRIC COMPANY** | |

|  |  |
|---|---|
| Debtor.<br>Tax I.D. No. 94-0742640 | SUPERPRIORITY CLAIMS,<br>(III) MODIFYING THE<br>AUTOMATIC STAY,<br>(IV) SCHEDULING FINAL HEARING<br>AND (V) GRANTING RELATED<br>RELIEF<br><br>Date:<br>Time:<br>Place: |

I, David Kurtz, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

1. I am a Vice Chairman of U.S. Investment Banking and the Global Head of the Restructuring Group of Lazard Frères & Co. LLC ("**Lazard**") and one of the lead restructuring advisors to PG&E Corporation ("**PG&E Corp.**") and Pacific Gas and Electric Company (the "**Utility**" or the "**Borrower**"), as debtors and debtors-in-possession (collectively, "**PG&E**" or the "**Debtors**" and together with their non-Debtor subsidiaries, the "**Company**") in the above-captioned Chapter 11 Cases (the "**Chapter 11 Cases**"). I submit this declaration (this "**Declaration**") in support of the *Motion of Debtors for Interim and Final Orders[1] (I) Authorizing the Debtors to Obtain Senior Secured, Superpriority, Postpetition Financing, (II) Granting Liens and Superpriority Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing and (V) Granting Related Relief*, filed concurrently herewith (the "**DIP Motion**").[2]

2. The statements in this Declaration are, except where specifically noted, based on my personal knowledge or opinion, on information that I have from PG&E's books and records, PG&E's employees, PG&E's advisors and their employees, or from other members of the Lazard team working under my supervision or direction. Specifically, I have overseen a Lazard team which, since November 2018, has been one of the principal advisors to PG&E concerning the

---

[1] *Motion of Debtors for Interim and Final Orders* is made pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(3) and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1 and 4001-1 of the Bankruptcy Local Rules of the United States Bankruptcy Court for the Northern District of California (the "**Local Rules**").

[2] Capitalized terms used but not otherwise defined in this Declaration have the meanings used in the DIP Motion.

possibility of restructuring under chapter 11. More generally, my colleagues at Lazard have provided various investment banking and financial advisory services to the Company for nearly a decade. In my capacity as Global Head of the Restructuring Group of Lazard, I have been privy to and have advised regarding PG&E's decision to seek chapter 11 relief. I am not being specifically compensated for this testimony other than through payments received by Lazard as a professional whose retention the Debtors are seeking to obtain this Court's approval of pursuant to an application to be filed with this Court at a later date. I am over the age of 18 years and authorized to submit this declaration on behalf of PG&E. If I were called upon to testify, I could and would competently testify to the facts set forth herein.

### **Qualifications**

3. Since 2002, I have been employed by Lazard, the primary U.S. operating subsidiary of an international financial advisory and asset management firm. Lazard is registered as a broker-dealer with the Securities and Exchange Commission and the Financial Industry Regulatory Authority. Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 150 years. Lazard and its professionals have considerable expertise and experience in providing investment banking and financial advisory services to financially distressed companies and to creditors, equity holders, and other constituencies in reorganization proceedings and complex financial restructurings, both in and out of court. In addition, Lazard's investment banking professionals have extensive experience in advising debtors in chapter 11 cases and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees, and buyers in chapter 11 proceedings.

4. I am currently a Vice Chairman of U.S. Investment Banking and the Global Head of Lazard's Restructuring Group. I have a broad range of experience in financial advisory assignments, including extensive experience with advising companies, creditors, and investors in connection with numerous in-court and out-of-court restructurings, recapitalizations, financings and sale transactions. During the course of my career at Lazard, I have advised companies and creditor groups in connection with raising capital in the bankruptcy context, including assisting

-3-

Case: 19-30089    Doc# 23    Filed: 01/29/19    Entered: 01/29/19 02:30:41    Page 3 of 13

chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession and exit financing loans. I also have extensive experience representing companies, creditors, and other constituencies in transactions involving the sale of all or substantially all of a company's assets. Additionally, I have performed numerous enterprise valuations in the bankruptcy context. I have submitted declarations and provided expert testimony related to those matters in a number of chapter 11 cases.

5. Prior to joining Lazard, I was a partner at Mayer, Brown & Platt from 1986 to 1989, a partner at Jones Day from 1989 to 1999, and a senior partner in the Corporate Restructuring Department at Skadden, Arps, Slate, Meagher & Flom LLP from 1999 to 2002. I hold FINRA Series 7 General Securities Representative, Series 79 Investment Banking Representative, and Series 24 General Securities Principal licenses. I have a J.D. and B.A. from Case Western Reserve University. I am a fellow of the American College of Bankruptcy and served as a member of its board of directors from 2005 to 2011. I am also a frequent lecturer on bankruptcy and reorganization-related topics and I have co-authored "Representing the Unsecured Creditors' Committee in Insolvency Restructurings", Workout & Turnarounds II (1999), Wiley and Sons.

## Background to the Proposed Postpetition Financing

6. Lazard has worked closely with the Debtors' management and other professionals retained by the Debtors and has become well-acquainted with its capital structure, liquidity needs, business operations and regulatory environment. Contemporaneously with the Company's consideration of a potential chapter 11 filing, Lazard worked closely with the Debtors' management to evaluate chapter 11 financing needs and alternatives. As described in the Wells declaration, Lazard worked with the Company and its other advisors in connection with adjustments made by the Debtors to their operating projections for chapter 11 impacts and to take into account the working capital decline anticipated to occur following expected ratings downgrades and the issuance of the notice required by SB-901. We also worked with the Company to develop a DIP financing structure suited to the Company's borrowing needs. Through that work the Debtors concluded that maximizing revolving credit availability (including letter of credit

availability) would be to the Company's advantage by allowing the Company to better match its borrowings to cash needs over time and thereby minimize interest costs.

### Marketing and Negotiation of the DIP Facility

7. Leading up to the Petition Date, the Debtors, with the assistance of Lazard, engaged in a thorough and competitive marketing process to obtain postpetition DIP financing.

8. The Debtors' primary strategic considerations when marketing the financing opportunity was to (i) support the Debtors' need to finance its operations, capital investments, working capital requirements and chapter 11 expenses for the pendency of the Cases, (ii) provide substantial revolving credit capacity (including a Letter of Credit ("**LC**") facility), (iii) provide the Company with operational and financial flexibility and time to pursue a holistic restructuring strategy to address wildfire claim resolution and other critical imperatives, and (iv) to secure committed financing at the most favorable terms to limit the debt service cost during these Cases.

9. The Debtors, with the assistance of Lazard and AlixPartners, conducted financial analyses to size the proposed facility and analyze financing proposals. The analysis was based on the Debtors' projected cash flow and liquidity needs through December 2020, taking into account the Company's operating cash flows, required capital investments, interest and fees to finance these Cases, expected collateral postings and expenses to be paid in connection with the chapter 11 process. Based on that analysis, the Debtors sought $5.5 billion of DIP financing.

10. In early January 2019, the Debtors, with the assistance of Lazard, began a marketing process to obtain postpetition financing. Given the size of the required financing, the Company's cash flow profile, desired flexibility to use letters of credit to secure significant collateral posting requirements, and to minimize the debt service cost of the overall financing, the Debtors sought to obtain DIP financing comprised of a $3.5 billion revolving credit facility and $2 billion of term loan debt.

11. On January 7, 2019, the Debtors, with the assistance of Lazard, contacted eight major money center banks (together, the **"Potential Lenders"**). Each of the eight Potential

Lenders signed a non-disclosure agreement ("**NDA**") with PG&E and received an invitation to meetings with management later in the week.

12. The Debtors and Lazard initially met with the Potential Lenders on January 9 and 10, 2019, in individual meetings held in New York City. In order to fully evaluate the DIP financing request, the Potential Lenders were presented information with respect to a number of relevant issues including but not limited to (a) the context and reason for financing; (b) PG&E's ongoing conversations with regulators, State government and other stakeholders; (c) an initial DIP financing term sheet (describing the framework for the potential DIP financing, but not economic terms); (d) a monthly financial forecast through December 2020 with underlying assumptions that provided estimates for the Company's operations and included forecasts of costs related to chapter 11; and (e) the proposed timeline for negotiations and agreeing to terms with a Potential Lender.

13. Subsequent to the meetings, Lazard provided Potential Lenders access to the Debtors' virtual data room for lender diligence and solicited counterproposals in response. In the days following the initial meetings, the Debtors and their advisors engaged in multiple due diligence calls and conversations with the Potential Lenders. Ultimately, each of the eight Potential Lenders submitted initial, non-binding term sheets between January 10 and 12, 2019. In addition, all but one of the Potential Lenders provided a "highly confident letter" in response to the Company's request indicating the Potential Lender's belief that the Company could successfully obtain $5.5 billion of debtor in possession financing.

14. The Debtors and Lazard evaluated these proposals side-by-side to compare terms and conditions on January 11 and 12, 2019. In evaluating the proposals, the Debtors and Lazard considered each Potential Lender's indicative proposed economics, perceived ability to fully commit and underwrite the entire facility if needed, financing structure, perceived deal risk, market flex and proposed covenants, among other factors. Of the eight proposals, four offered a full 100% underwriting and four offered to provide only a portion of the requested DIP facilities.

-6-
Case: 19-30089    Doc# 23    Filed: 01/29/19    Entered: 01/29/19 02:30:41    Page 6 of 13

15.     Following this review, the Debtors, with the assistance of Lazard, called each of the Potential Lenders to advise that a counterproposal would be coming later in the day and that to be considered in Round 2 the Potential Lender would need to offer a fully 100% underwritten deal. In addition, Potential Lenders were asked to provide prepetition financing in the form of a $250,000,000 short-term loan facility (**"Prepetition Bridge Facility"**) to protect against the risk that the Debtors' liquidity could be exhausted by working capital declines following the credit rating downgrades and related trade tightening and collateral demands expected as a result of the SB-901 notice. As planned, Lazard circulated a second round counterproposal to Potential Lenders on January 13, 2019, and asked Potential Lenders to provide comments by January 14, 2019. Six of the Potential Lenders submitted revised proposals on Monday, January 14, 2019, and most included the requested Prepetition Bridge Facility. The Debtors, with assistance from Lazard, then undertook similar quantitative and qualitative analyses to compare the updated proposals.

16.     The Debtors determined that the revised proposal submitted by J.P. Morgan met each of their requirements and was the best financing proposal available. J.P. Morgan's proposal was not only in line with the most favorable economic terms received by PG&E, but also offered the least restrictive covenants and the largest revolver hold position of all proposals received.

17.     The Debtors appointed J.P. Morgan as the lead arranger for the DIP financing on January 15, 2019. Based on other strong and competitive offers, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Barclays and Citigroup were chosen by PG&E to co-arrange and underwrite the DIP facility (collectively with J.P. Morgan, the "**DIP Underwriters**"; the DIP financing underwritten by the DIP Underwriters being the **"DIP Facility"**) on the condition that all of these additional DIP Underwriters likewise agree to the same level of revolver commitment hold position as J.P. Morgan and otherwise agree to the other terms and conditions of the final J.P. Morgan proposal. The large revolver hold position was important as it assured the Debtors of obtaining their desired $3.5 billion revolving credit facility. Between January 15 and January 21, 2019, the Debtors, with the assistance of Lazard, counsel and other advisors, negotiated the terms of the DIP Facility commitment papers, including a longer form term sheet (the **"DIP Term**

**Sheet"**). Simultaneously, the parties also negotiated the commitment letter and definitive documentation for the Prepetition Bridge Facility. These negotiations were conducted at arm's-length and were extensive and vigorous.

18. During the DIP marketing process, and more so following the filing of the Debtors' January 14, 2019, Form 8-K, which provided public notice of the Debtors' intended chapter 11 filing, the Debtors received several reverse inquiries from various lending sources. The Debtors and Lazard investigated these inquiries and explored whether such institutions would be willing to provide financing on more competitive terms than those being negotiated with the DIP Underwriters. Only one alternative lender offered to provide a term loan facility on competitive terms but was unable to provide revolving credit in a similar structure and on terms similar to the DIP Underwriters' proposal. In response to this specific reverse inquiry, the Debtors and Lazard further negotiated with J.P. Morgan and the other DIP Underwriters and were able to further improve economic terms and reduce market flex. It also became apparent through this dialogue that the revolving credit facility that the DIP Underwriters were providing might not be available (or if available, only on much more expensive terms) if the DIP Underwriters did not also arrange the term loan.

19. On January 21, 2019, the Debtors and the DIP Underwriters entered into a commitment letter and DIP Term Sheet for the $5.5 billion DIP Facility. Also, on the same date, PG&E Corp. and the Utility entered into a commitment letter with J.P. Morgan related to the Prepetition Bridge Facility. As of the Petition Date, the Debtors had not drawn on the Prepetition Bridge Facility.

**Overview of the DIP Facility**

20. A brief summary of the DIP Facility terms are provided below[3]:

| DIP Facility | $5.5 billion<br>- DIP Revolving Credit Facility: $3.5 billion, inclusive of $1.5 billion L/C Sub-Facility |
|---|---|

---

[3] Terms are subject to market flex and syndication.

| | |
|---|---|
| | - DIP Term Loan Facility: $1.5 billion<br>- DIP Delayed Draw Term Loan: $500 million |
| **Maturity Date** | December 2020 with a one-year extension subject to a 25 bps fee |
| **Pricing** | DIP Revolving Credit Facility: L + 225 bps (37.5 bps unused fee); L/C Sub-Facility fronting fee of 12.5 bps per annum<br><br>DIP Term Loan Facility: L + 250 bps / 99.5 OID; ticking fees apply<br><br>DIP Delayed Draw Term Loan: L + 250 bps / 99.5 OID; unused fees apply |
| **Interim Availability** | DIP Revolving Credit Facility: $1.5 billion; cannot be repaid until Final Order (by April 15th)<br><br>DIP Term Loan Facility and DIP Delayed Draw Term Loan: Available at Final Order (by April 15th) |
| **Prepayment** | DIP Revolving Credit Facility: fully prepayable<br><br>DIP Term Loan Facility and DIP Delayed Draw Term Loan: Prepayable subject to a 101 soft call for first 6 months, par otherwise |
| **Collateral** | Superpriority administrative claim status; first lien on substantially all assets; DIP Revolving Credit Facility, DIP Term Loan Facility and DIP Delayed Draw Term Loan are secured on a pari passu basis |
| **Incremental Facility** | $4.0 billion with 50 bps MFN; 15 month sunset |

21. The DIP Facility consists of three components: (a) a first lien superpriority revolving credit facility (the "**DIP Revolving Credit Facility**") with aggregate commitments of $3.5 billion and a letter of credit sub-facility (the "**DIP L/C Sub-Facility**") in an aggregate amount of $1.5 billion; (b) a term loan facility (the "**DIP Term Loan Facility**") in an aggregate principal amount of $1.5 billion; and (c) a delayed draw term loan facility in an aggregate principal amount of $500 million (the **"DIP Delayed Draw Term Loan"**). The DIP Revolving Credit Facility is larger than similar DIP revolving credit facilities and allows the Company to limit overall debt service costs given the need for funds over the course of the duration of the facility; furthermore, the DIP L/C Sub-Facility is beneficial to the Company to meet ongoing letter of credit needs at an economically attractive price. PG&E may use the DIP Facility for working capital and general

corporate purposes, and to pay fees, costs and expenses incurred in connection with the administration of the Chapter 11 Cases.

22. The DIP Facility also provides flexibility to PG&E to use $4 billion of asset sale and condemnation proceeds for general corporate purposes; for any proceeds above the $4 billion carve-out, the Company maintains a reinvestment right of 180 days, subject to a further 180 day extension, thereby providing significant flexibility to PG&E to finance its business. Furthermore, the DIP Facility is structured with an extension option for a third year in order to accommodate the Company in the event that the Chapter 11 Cases extend beyond the original December 2020 maturity date of the financing. The DIP Facility additionally provides the Company with permission to raise up to $4 billion of incremental, pari passu DIP financing to fund a third year of the Chapter 11 Cases and/or address other financing needs that result while in chapter 11.

23. The DIP Facility is unique for a postpetition financing facility of its size in that it provides PG&E with substantial flexibility to pursue their reorganization efforts. The DIP Facility does not subject PG&E to any milestones related to a sale or plan process, thereby enhancing the likelihood that PG&E will have adequate time and flexibility to develop and implement a restructuring that is in the best interests of their estates. Further, the DIP Facility contains no financial covenants. Accordingly, based upon the marketing process conducted, and due to the DIP Facility's competitive economic terms and flexible structure, I believe it is the best financing currently available to PG&E.

24. It is my view that the DIP Facility provides a vehicle for PG&E to pursue a successful reorganization of their businesses. I believe that through a competitive process, PG&E was able to obtain the necessary financing on the best terms currently available in the market.

**The Fees in Connection with the DIP Financings Are Reasonable**

25. PG&E has agreed, subject to Court approval, to pay approximately $95.25 million in aggregate fees to the DIP Agents, arrangers, and the DIP Lenders pursuant to the DIP Documents as consideration for the extension of postpetition financing. These fees constitute

-10-
Case: 19-30089   Doc# 23   Filed: 01/29/19   Entered: 01/29/19 02:30:41   Page 10 of 13

approximately 1.7% percent of the $5.5 billion DIP Facility being provided by the DIP Underwriters.

26. I believe that these fees were the subject of arms'-length and good-faith negotiations between PG&E and the DIP Underwriters, are integral components of the overall terms of the DIP Facility, and were required by the applicable DIP Underwriters as consideration for the extension of postpetition financing. Indeed, it is my belief that PG&E's competitive DIP financing process and the ability to combine bank groups resulted in reductions in proposed fees and pricing over the course of negotiations. In light of PG&E's circumstances, I believe that the fees provided for in the DIP Facility are reasonable.

## The DIP Facility Should Be Approved

27. Based on the Debtors' and their advisors' efforts to market and negotiate the DIP Facility, current market conditions, PG&E's circumstances, my experience and my participation in and supervision of the negotiations around the DIP Facility and the broader restructuring transaction, I believe that the DIP Facility represents the best option currently available to address PG&E's liquidity needs and that the terms and conditions of the DIP Facility are the product of arm's-length negotiations and are reasonable given the circumstances.

28. I believe that PG&E will benefit from the strong message that the DIP Facility would likely provide to PG&E's customers, vendors, employees, and contract counterparties regarding the sufficient funding of PG&E's operations. I believe that this message will help to stabilize PG&E's operations and supply chain at the outset of these Chapter 11 Cases, which will assist PG&E in continuing to provide natural gas and electric service to its millions of customers, and help to mitigate the possible substantial harm that commencement of these Chapter 11 Cases could have on the value of PG&E's estates.

29. I further believe that the DIP Facility will help PG&E respond to the need for an orderly, fair and expeditious process to assess and resolve PG&E's potential liabilities resulting from the 2017 and 2018 Northern California wildfires; and allow PG&E to preserve and maximize

the value of its business enterprise for the benefit of all of its economic stakeholders, including wildfire claimants, PG&E's other creditors, and PG&E Corp.'s shareholders.

30. Importantly, the DIP Facility does not provide for any significant case controls or milestones (other than those related to entry of the DIP Orders), providing PG&E with the type of flexibility that should increase the likelihood of a successful reorganization. It is my conclusion, therefore, that PG&E has evaluated all of their reasonably available options for postpetition financing within the timeframe available and that the DIP Facility represents the best currently available option for meeting PG&E's financing needs.

*Remainder of the page intentionally left blank.*

-12-

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on: January 29, 2019

_____
David Kurtz
Vice Chairman of U.S. Investment Banking and Global Head of Restructuring
Lazard Frères & Co. LLC

*Proposed Financial Advisor and Investment Banker for Debtors and Debtors-in-Possession*